## Frick v. Stevens

*John E. Slike, David E. Maxwell, David B. Buerger, James C. Park* and *James D. Morton,* for plaintiff.

*George F. Douglas, Jr.,* and *Sylvia H. Rambo,* for defendant.

WEIDNER, P. J., May 25, 1967.—Complaint in equity was filed by plaintiff, Helen C. Frick, against defendant, Sylvester K. Stevens, for a permanent injunction to enjoin and prohibit the sale and distribution of a book entitled, "Pennsylvania: Birthplace of a Nation" written by defendant, Sylvester K. Stevens.

Plaintiff, Helen C. Frick, is a daughter and sole survivor, of Pennsylvania industrialist Henry Clay Frick, who died a resident of Pittsburgh, Pa., on December 2, 1919.

Defendant, Dr. Sylvester K. Stevens, is chairman of the Pennsylvania Historical Society and under contract with Random House, Inc., of New York City, New York, was the author of the book, "Pennsylvania: Birthplace of a Nation".

At Christmas, 1964, Helen C. Frick was given a copy of "Pennsylvania: Birthplace of a Nation" as a present, by Dr. Sylvester K. Stevens. She referred to the index to discover the references in the book to her father, Henry Clay Frick. After reading them, she instituted this action.

STATEMENT OF PLEADINGS

The pleadings consist of the complaint, answer and amendment to the answer.

The complaint avers that Helen C. Frick is the daughter of Henry Clay Frick who died December 2, 1919. It is averred that during his lifetime, Henry Clay Frick was an upright and honorable man and as an employer of labor, he treated working men fairly, paid wages which were reasonable and in line with current conditions, provided safety equipment of the best quality in existence and greatly improved the quality of homes rented to employes. Further, as a progressive businessman, he developed Pennsylvania industries in a way to benefit the people of the State and to improve the welfare of its inhabitants. As a result he was and is esteemed and respected as a person of good name and reputation.

It is averred that Helen C. Frick shared in the reputation of her father and has engaged in philanthropies in honor of the memory of her father, and, as a result, has become associated with the memory of her father in the mind of the public, and that anything tending to blacken the memory of Henry Clay Frick is of special significance to Helen C. Frick and would tend to lower Helen C. Frick in the esteem of the community.

It is averred that defendant, Sylvester K. Stevens, has caused to be published the book entitled, "Pennsylvania: Birthplace of a Nation". Further, that he caused the book to be widely circulated throughout the Commonwealth of Pennsylvania.

It was averred in paragraph 7 of the complaint as follows:

"At page 251 of his book, defendant stated:

" 'The Rev. George Hodges arrived in Pittsburgh in 1881 to become pastor of the Calvary Ascension Church attended by Henry Clay Frick and more

Pittsburgh tycoons than any other single Pittsburgh church. Unshaken by this array of wealth in his church, not all of which had been amassed in exact accord with what many regarded as Christian principles and practices, Mr. Hodges preached and acted as an apostle of social reform' ".

And further, that these statements were malicious and dafamatory.

However, by stipulation of counsel, this alleged malicious and defamatory passage in the book has been withdrawn and eliminated from consideration as a basis for this action.

It is averred in paragraph 9 of plaintiff's complaint as follows:

"At page 226 of his book, defendant stated:

" 'In the bituminous fields of western Pennsylvania Henry Clay Frick had built a similar monopoly of coal and coke production and was equally successful in beating down efforts at unionization. Frick also made extensive use of immigrant labor and cut wages to an average of about $1.60 a day while extracting the longest hours of work physically possible. Most mines of the time were without anything resembling modern safety appliances or practices and serious accidents were common.

" 'Still another abuse was the company town with its company store. The coal companies owned the houses, shoddy wooden shacks without sanitary facilities, which they rented at a high price to workers' ".

It is averred that these statements are false, scandalous, malicious and defamatory of Henry Clay Frick and of the plaintiff.

It is averred in paragraph 11 of the complaint as follows:

"At page 209 of his book, defendant stated:

" 'The power of the union was broken in the bloody

and disastrous Homestead strike in 1892 by stern, brusque, autocratic Henry Clay Frick' ".

It is averred that these statements are entirely false, scandalous, malicious and defamatory of Henry Clay Frick and of the plaintiff.

It is averred that the statements above were maliciously, negligently and recklessly made and that although retraction was demanded, no retraction is made.

It is averred that plaintiff, Helen C. Frick, has suffered a loss of reputation and public esteem and that further distribution and dissemination of the book constitutes a continuing trespass against plaintiff, Helen C. Frick, and the memory of her father.

Plaintiff asks this court to grant an injunction:

1. Permanently enjoining and prohibiting defendant from distributing or permitting others to distribute the book entitled, "Pennsylvania: Birthplace of a Nation".

2. Permanently enjoining and prohibiting defendant from selling or offering to sell or permitting others to sell or offer to sell the book, "Pennsylvania: Birthplace of a Nation".

3. Such other equitable relief as may be deemed necessary and proper.

Defendant answers and avers that the statements are not defamatory of Henry Clay Frick, deceased, or of plaintiff, Helen C. Frick; that the statements are true; that in the absence of malice the statements are privileged under the First and Fourteenth Amendments of the Constitution of the United States; and further that no relief can be granted because defendant is not publishing or distributing the book, but was solely the author under contract with Random House, Inc., of New York City, New York.

### STATEMENT OF ISSUES RAISED

1. Will a court of equity grant injunctive relief to

protect personal rights as distinguished from property rights?

2. Do the First and Fourteenth Amendments to the Constitution of the United States prohibit injunctive relief against defamation?

3. Does article I, sec. 7, of the Constitution of the Commonwealth of Pennsylvania prohibit injunctive relief against defamation?

4. Is the book, "Pennsylvania: Birthplace of a Nation" defamatory of Henry Clay Frick or plaintiff, Helen C. Frick, under the United States Constitution?

5. Is the book, "Pennsylvania: Birthplace of a Nation" defamatory under Pennsylvania Law?

6. Does the book, "Pennsylvania: Birthplace of a Nation" invade the privacy of Helen C. Frick or intentionally inflict mental distress upon Helen C. Frick?

7. May any relief be granted?

### FINDINGS OF FACT

. . .

18. Henry Clay Frick had entered the coke business in the early 1870's.

19. By the late 1880's, Henry Clay Frick had built a monopoly of the coke production in Western Pennsylvania.

20. The statement that he had built a monopoly of bituminous coal production was not libelous.

21. The statement that he was successful in beating down efforts at unionization in his coke and coal holdings is true.

22. The statement that Henry Clay Frick made extensive use of immigrant labor in his coke and coal holdings is true.

23. On more than one occasion, Henry Clay Frick cut wages.

24. On February 1, 1894, Henry Clay Frick cut wages to his coke workers by 22 percent.

12

25. On February 1, 1894, Henry Clay Frick cut wages to an average of about $1.60 per day.

26. In 1886, average daily wages of miners had been $1.41 to $2.00 and were increased to an average of $1.75.

27. The Frick coke and coal employes worked a 10-hour day.

28. Ten hours a day were the longest working hours physically possible on a sustained basis in the coke and coal industry.

29. "Most mines of the time", and the statements appearing thereafter applied to the entire bituminous industry of which Henry Clay Frick owned less than 10 percent.

30. The Frick mines, as well as the other bituminous mines, were without anything resembling modern safety appliances or practices, and serious accidents were common.

31. The words, "The coal companies", and the phrases referring to their company towns, company stores, and company houses, applied to the bituminous coal mines of Western Pennsylvania, of which Henry Clay Frick owned less than 10 percent.

32. Defendant in his amended answer admitted that Mr. Frick did not have a monopoly of coal production as stated on page 226 of the book.

33. The Frick company towns, as well as those of the other bituminous mine owners, were company owned houses that were shoddy wooden shacks without any sanitary facilities, which the operators rented at a high rate to the workers.

34. The Frick company stores, as well as those of the other bituminous mine owners, charged the workers higher prices than privately owned stores.

35. The Frick company, as well as the other coke and coal companies, issued paper scrip to their employes, so that they could see how much the employes were patronizing the company store.

36. The sentence, "The power of the union was broken in the bloody and disastrous Homestead strike in 1892 by stern, brusque, autocratic Henry Clay Frick" did not imply that Henry Clay Frick caused the bloodshed, but that Henry Clay Frick broke the power of the union.

37. Before the negotiations with the Amalgamated Association had terminated, Henry Clay Frick had built a wall around the Homestead works, which wall was topped with barbed wire, and contained loop-holes, both of which Mr. Frick admitted to the Congressional Committee were for the defense of the plant.

38. Before the negotiations with the Amalgamated Association had terminated, Henry Clay Frick had contacted the Pinkerton Detective Agency to secure a large force of men to be used at the plant.

39. Prior to the arrival of the force of 300 Pinkerton men, Henry Clay Frick had arranged for two barges to be prepared for sleeping and eating quarters for these men, and to be armor plated for their protection.

40. Mr. Frick had arranged with Mr. Pinkerton for 300 Winchester Repeater rifles to be shipped in from Chicago for the use of the Pinkerton men.

41. On June 29, 1892, the Pittsburgh Chronicle Telegraph said that on the previous day Senator Vest had spoken in Congress on the Homestead mill being barricaded, with loop-holes to shoot down men.

42. On July 2, 1892, the Pittsburgh Dispatch pointed out that there would be serious trouble if the Carnegie Company attempted to populate the works, that there were 1,000 men at the river bank, and 50 skiffs and the fast steam launch, Edna, guarding against a river approach.

43. Henry Clay Frick did not appeal to the governor for the militia.

44. On July 6, 1892, Mr. Frick sent the 300 Pinkerton men to the plant by the river.

45. No one knows who fired the first shot, but there was bloodshed on both sides.

46: Henry Clay Frick was responsible for the bloodshed, although not solely responsible.

47. Henry Clay Frick was a prominent public person and injected himself into the vortex of a public issue.

48. On page 224 of his book, only two paragraphs prior to the statement as to Mr. Frick's hours, Sylvester K. Stevens stated:

"Abundant contract immigrant labor so readily available in steel mills meant a twelve-hour day and a seven-day week for most unskilled labor. From seven in the morning until six at night for two weeks was followed by the 'long run' which meant from seven on Sunday morning through twenty-four hours up to Monday morning for a particular crew. . . .

". . . At the age of thirty-five even the best of steel workers were beginning to be 'burned out' by the hours and strain". (This referred to steel workers.)

49. In the Connellsville region, where the Frick miners worked, the coal was very soft and easily mined.

50. Sylvester K. Stevens stated in his book that the coal companies rented shoddy wooden shacks to workers at a high price.

51. Mr. Frick testified at the Congressional hearing that his purpose in hiring the Pinkerton watchmen was to protect the property of the company.

52. Sylvester K. Stevens in his deposition testified that the wage cut referred to in the book occurred in 1886, and other dates at other times.

. . .

78. The statement, "In the bituminous fields of Western Pennsylvania Henry Clay Frick had built a

similar monopoly of coal and coke production and was equally successful in beating down efforts at unionization. Frick also made extensive use of immigrant labor and cut wages to an average of about $1.60 a day, while extracting the longest hours of work physically possible. Most mines of the time were without anything resembling modern safety appliances or practices and serious accidents were common.

"Still another abuse was the company town with its company store. The coal companies owned the houses, shoddy wooden shacks without sanitary facilities, which they rented at a high price to workers", is not defamatory.

79. The statement, "Most mines of the time were without anything resembling modern safety appliances or practices and serious accidents were common", does not refer only to Henry Clay Frick.

80. The statement, "Still another abuse was the company town with its company store. The coal companies owned the houses, shoddy wooden shacks without sanitary facilities, which they rented at a high price to workers", does not refer solely to Henry Clay Frick.

81. The statement, "The power of the union was broken in the bloody and disastrous Homestead strike in 1892 by stern, brusque, autocratic Henry Clay Frick", is not defamatory.

82. The statement, "In the bituminous fields of Western Pennsylvania Henry Clay Frick had built a similar monopoly of coal and coke production and was equally successful in beating down efforts at unionization. Frick also made extensive use of immigrant labor and cut wages to an average of about $1.60 a day while extracting the longest hours of work physically possible", is true.

83. The statement, "Most mines of the time were without anything resembling modern safety appli-

ances or practices and serious accidents were common", is true.

84. The statement, "Still another abuse was the company town with its company store", is true.

85. The statement, "The coal companies owned the houses, shoddy wooden shacks without sanitary facilities, which they rented at a high price to workers", is true.

86. The statement, "The power of the union was broken in the bloody and disastrous Homestead strike in 1892 by stern, brusque, autocratic Henry Clay Frick", is true.

87. Plaintiff, Helen C. Frick, is not named or identified in the book, "Pennsylvania: Birthplace of a Nation".

88. Defendant's statements about Henry Clay Frick are not malicious.

89. Defendant's statements about Henry Clay Frick, if in error, were not made with knowledge of their falsity or with reckless disregard of whether false or not, but were based on reasonable investigation and research.

90. There is no abuse of privilege by defendant.

DISCUSSION

The book, "Pennsylvania: Birthplace of a Nation" concerns the history of Pennsylvania from its geological beginning to the very recent administration of Governor William W. Scranton, which began in 1962. Chapter 12, entitled, "A Golden Age for a Titan of Industry", deals with the period of the history of Pennsylvania between the Civil War and 1900. It contains 13 subchapters dealing with the industrial development of the Commonwealth during that period and labels it "A Golden Age".

The book must be considered as a whole, from the beginning to the end, in order to determine whether it is defamatory. Separate paragraphs and sentences

may not be isolated from the balance and independently examined apart from the whole and thereby isolated as so offending, when, if taken with the whole, that effect could not properly be given them. To determine the meaning of the article it must be read as a whole and each word must be read in the context of all the other words: MacRae v. Afro-American Co., 172 F. Supp. 184; Houston v. Interstate Circuit, 132 S. W. 2d. 903 (Tex. Civ. App.); Restatement, Torts §563d.

However, certain extracts are particularly important to an understanding of this case. They are:

(1) Chapter 12, page 205:

"Pennsylvania before the Civil War had hardly scratched the surface of its potential as a great industrial state. . . . The stage was set for Pennsylvania to become a true titan of industry in the last decades of the nineteenth century".

(2) Chapter 12, page 207:

"Three factors changed Pittsburgh and its environs from the 'Iron City' to the 'Steel City.' . . . The last (third) and possibly the most important of all the ingredients which turned Pittsburgh into a 'city of crucible, forge and mill' was shrewd business leadership".

(3) Chapter 12, page 226.

"Labor had two weapons with which to fight the newly powerful corporations. One of these was creating and strengthening the organization of labor in strong unions. The second was the strike; union organization usually led directly to use of the strike. All too often before 1900 the strike led to the downfall of the union".

(4) Chapter 12, page 228:

"Equally unfortunate and even more damning to labor was the Homestead strike in 1892".

(5) Chapter 12, page 229:

"It was an era in which capital thrived with virtually no limitations upon its power to do as it pleased. Neither corporations nor individuals were burdened with more than a modicum of taxation by the state or national government, and even the income tax had been struck down by the courts. Labor could be dealt with just about as management pleased, and while strikes were unpleasant they ended uniformly by strenghtening capital rather than labor. Viewing it from almost any angle, one finds it hard to think of the years from 1865 to 1900 as anything other than a golden age for the titan of industry which Pennsylvania had spawned".

Also to be considered are the following endorsements on the cover of the book (Defendant's exhibit 3):

"Dr. Sylvester K. Stevens is a talented historian and he brings to *Pennsylvania: Birthplace of a Nation* an obvious love of the Keystone State. Much of America's greatness — political, economic, cultural happened in Pennsylvania and the author has caught the spirit of it all. This book provides an excellent background for Pennsylvania's future, which is destined to be a bright one". William W. Scranton, *Governor*. (Italics supplied.)

"Pennsylvania has waited long for a book of this character". Roy F. Nichols, *Vice-Provost*, University of Pennsylvania. (Italics supplied.)

"One could have found no author nearly so good for this particular volume as Dr. Stevens. Pennsylvania is one of the most important of the states, and it has thus far been without a truly excellent single-volume history". Allen Nevins.

"Sylvester K. Stevens is a first-rate scholar as well as a man with most excellent writing style. I can think of no one more likely to do a sound, thoroughly read-

able book on the state of Pennsylvania than Dr. Stevens". Bruce Catton.

Miss Frick asks this court to find that her father was and is a well known businessman and philanthropist. Further, that she has dedicated her life, her business, and their family fortune to perpetuating his memory. Yet on the other hand she does not want the public to know anything further of her father, particularly his role in the industrial times in which he operated, the manner of his operation, or how he amassed a fortune, which she is now devoting to perpetuating his memory. She disclaims any knowledge of his business, his business operations, or his business character and she does not wish anyone else to know anything about it, write anything about it, or speak anything about it, unless favorable and laudatory. She wants this court, after finding that he was a well-known businessman and philanthropist, further to find that to know the details of her father's business dealings would lower her and her father in the esteem of the community, and further, that for the public to know those facts would cause her emotional distress.

Because Miss Frick has, as Henry Clay Frick did put the spotlight on his business reputation, the public is now entitled to know about all the facts, not just those which she wishes to reveal and which are favorable to him, and to debate them.

Further, to enable people to understand and meet the conditions with which they are confronted today, particularly in industry, labor and management, the public is entitled to know the history of the development of those subjects. They are important topics today and the development of them is of importance to the student of history, the student of economy and the student of labor relations. Industrial conditions and particularly labor relations are current subjects and problems. The public is therefore entitled to know the

history of their development in order to understand the history and conditions today in those fields.

Simply, Miss Helen C. Frick seeks to enjoin publication and distribution of the book, "Pennsylvania: Birthplace of a Nation" in its present form because she does not believe certain statements about her father, Henry Clay Frick, in his business dealings. She admits she knows nothing of his business dealings, but claims they must be untrue because of the character of his personal relations with her as his daughter.

By analogy, Miss Frick might as well try to enjoin publication and distribution of the Holy Bible because, being a descendant of Eve, she does not believe that Eve gave Adam the forbidden fruit in the Garden of Eden, and because her senses are offended by such a statement about an ancestor of hers.

*Will a Court of Equity Grant Injunctive Relief to Protect Personal Rights as Distinguished from Property Rights?*

An injunction is the form of equitable proceeding which protects civil rights from irreparable injury, either by commanding acts to be done or by preventing their commission, where there is no adequate remedy at law. The power of the court to issue an injunction should be exercised with great caution and only where reason and necessity are clearly established. A party seeking an injunction must show at least prima facie a strong case entitling him to the relief requested. The power to grant an injunction should be exercised only in very clear cases and an injunction will not be issued when, upon a broad consideration of the situation of all the parties in interest, good conscience does not require it.

An injunction is a drastic and extraordinary remedy to be granted or denied in the sound discretion of the court under the circumstances of the particular

case. The granting of an injunction is a matter of grace and not of right. The question in each case must depend upon the circumstances out of which it grows, and requires the exercise of judgment in determining the equities involved.

A person must establish actual and substantial injury done or threatened in order to be entitled to injunctive relief.

In order to justify the granting of injunctive relief, the injury complained of must be substantial. Mere trifling annoyances or injuries are not sufficient grounds for an injunction.

An injunction will not be awarded where the benefit to plaintiff would be disproportionate to the injuries of defendant, or where its granting would be contrary to public welfare. A court ordinarily will take into consideration the relative inconvenience or injury which the parties will sustain by the granting or refusal of an injunction.

Courts of equity in Pennsylvania have consistently refused injunctive relief for libel or defamation, for various reasons. Usually it has been said that equity would protect property rights only and not personal rights. Sometimes the constitutional right to free speech and press has been given as the reason, as well as such other reasons as the availability of an adequate remedy at law and the right to trial by jury.

Also, an injunction will not issue on behalf of a relative for alleged defamation of a decedent: Eagles v. Liberty Weekly, 244 N. Y. Supp. 430; Houston v. Interstate Circuit, supra (Son of Gen. Sam Houston sought injunction against Motion Picture "Man of Conquest" concerning life of General Houston) ; Clere v. E. W. Edwards & Son, 1 N. Y. S. 2d 244; Kelly v. Johnson Publishing Co., 160 Cal. App. 2d 718, 325 P. 2d 659; Hughes v. New England Newspaper Pub-

lishing Co., 312 Mass. 178, 43 N. E. 2d 657; Wright v. R. K. O. Radio Pictures, 55 F. Supp. 639.

In Baltimore Life Insurance Company v. Gleisner, 202 Pa. 386 (1902), plaintiff insurance company sought a bill in equity for an injunction against Henry Gleisner, a former agent for the company, to enjoin Gleisner from soliciting plaintiff's policy holders and using false information to secure their business from the company. The court refused the injunction and stated that:

"So far as a cause of action is stated in the bill it is one for slander or libel, and cognizable at law. It is urged that the injury is a continuing one, for which there is no accurate measure of damages, and therefore is within the province of equity. But even in that class of cases the complainant's right must be so clear as to be practically conceded, or it must first be established by the verdict of a jury. In the present case complainant's right of action depends on facts, the burden of proof of which is on complainant, and which necessarily are for a jury in the first instance. The want of equity being apparent on the face of the bill, the demurrer was properly sustained".

The adequacy of the remedy at law and necessity of jury trial were the deciding factors in the case.

In Ashinsky v. Levenson, 256 Pa. 14 (1917), plaintiffs were Rabbi Ashinsky and the Beth Jacob Congregation, of which defendant was a member. Plaintiffs asked for an injunction to restrain defendant from entering into the synagogue or premises of the congregation, and from insulting, molesting, approaching, accosting or in any way speaking to Rabbi Ashinsky. The lower court granted the injunction restraining defendant from entering the synagogue or the premises of the congregation and from insulting or molesting the Rabbi Ashinsky in the synagogue or near the premises or in the public streets. On appeal the decree

was modified by striking out the part enjoining and restraining defendant from insulting or molesting Rabbi Ashinsky. The court said that the Rabbi had an adequate remedy at law and must resort to it for his protection, quoting Bispham, Equity (9th ed.) at 64, as follows:

"Equity is concerned only with questions which affect property, and it exercises no jurisdiction in matters of wrongs to the person or to political rights, or because the act complained of is merely criminal or illegal".

Adequacy of the remedy at law, and the fact that equity has no jurisdiction to protect personal rights, were the basis for the decision.

In Kraemer Hosiery Co. v. American Federation of Full Fashioned Hosiery Workers, 305 Pa. 206 (1931), plaintiff company sought an injunction against the American Federation of Full Fashioned Hosiery Workers, its local branches and officers, and other designated persons, including appellant Lewis Francis Budenz, to enjoin them from interfering with plaintiff's employes. The company had a written individual agreement with each employe, stating that while employed by plaintiff he would not join a labor union. Budenz was not an employe of plaintiff but was active in organization for a labor union. An action for a preliminary injunction was instituted against defendant's attempts to induce plaintiff's workers to join defendant's union, knowing that they would violate their individual contracts with their employer. On appeal by Budenz the court enjoined Budenz from using threats or intimidation, from sending libelous and scandalous letters, pamphlets or newspapers, and from picketing plaintiff's plant in combination with others. The court held that the individual agreement created no contract or property right. The court treated the case as though the individual contract did

not exist and as a case wherein the relation or status of employer-employe was at stake and was unlawfully interfered with by third parties. The majority opinion considered the act an unlawful conspiracy, and on that basis enjoined the libelous statements and literature. Mr. Justice Kephart, in the majority opinion, stated:

"The company's officials could have prosecuted the authors and publishers of these articles for libel, both civilly and criminally. In view of Near v. Minnesota, 283 U. S. 691, I will not discuss the power of courts to restrain future publication of libelous articles by the organ of the federation, even though done to influence the public mind, or to cause breaches of the peace, so long as there is no personal undertaking to injure directly an individual's business by reason of the publication; nor should the courts exercise the strong arm of injunction merely to aid one of the parties in a labor dispute because such libelous articles were published and circulated generally.

"But where appellant Budenz clearly overstepped any protection afforded him by the law or by Near v. Minnesota, supra, in relation to such publications, when, in addition to writing these articles and publishing and circulating generally the newspaper in which they were published, he personally appeared at the gates of the plant and distributed them to the employees as they left the plant, such acts, followed by others which I shall note, *created an unlawful conspiracy which may be enjoined, even though equity may not restrain a newspaper from future publications of such libels.* While defendants might not be enjoined from inducing others by lawful means to leave plaintiff's service and join the union, such purposes could not be effected by unlawful means, such as malicious falsehood, deceit, force, intimidation, or actual injury to plaintiff's property . . ." (Italics supplied.)

In a dissenting opinion Mr. Justice Maxey stated that he was convinced that the contract had no claim to the protection of equity and appellant, Budenz, was entirely within his rights in publicly criticizing it as unfair and illegal. Justice Maxey stated:

"There is but one issue in this case, and that is the issue of Budenz's right of free speech—his right to advocate by both written and spoken word the principles of labor unionism and to attack anti-union individual contracts".

Justice Maxey further stated:

" 'A court of equity acts only when and as conscience demands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then whatever may be his rights . . . in a court of law, he will be held remediless in a court of equity' ". (Italics supplied.)

Justice Maxey also stated:

"Enjoining violence and intimidation is one thing; enjoining individuals from peacefully urging, by speech or writing, workingmen to organize is quite another thing. No judge has a right to proscribe free speech by a particular individual simply because he disapproves of the ideas which that individual expresses". (Italics supplied.)

Here relief was granted because of the conspiracy. The dissenting opinion is important for the statement: "No judge has a right to proscribe free speech by a particular individual simply because he disapproves of the ideas which that individual expresses".

In Annenberg v. Roberts, 333 Pa. 203 (1938), the court enjoined a legislative committee from enforcing a subpoena duces tecum compelling defendants to produce documents because it constituted an unreasonable search and seizure within the meaning of the Fourth Amendment of the Federal Constitution or

article I, sec. 8 of the State Constitution. Here a right of privacy was enforced.

In Clayman v. Bernstein, 38 D. & C. 543 (1940), the court enjoined defendant, a doctor, from developing or making prints of certain films and negatives or using the prints in any manner, the photographs having been made of plaintiff's wife to show the facial disfiguration of the wife as a result of an illness she had suffered.

That decision is based on protection of the right of privacy. The case recognizes the right of privacy and is not based on defamation or enjoining defamation. The picture had been taken by plaintiff's wife's physician without her authority or consent. The court said that the husband's right of privacy was violated by the violation of the right of the privacy of the wife, while they were living together as husband and wife. Further the husband is liable for the wife's medical treatment and it is with him that the contract of the employment of defendant as the physician was made.

In Burch v. Sigourney Mellor, 43 D. & C. 597 (1942), the court refused to enjoin defendant from advertising in violation of the Act of April 28, 1899, making it unlawful for any person not a regularly licensed attorney to practice law or hold himself out to the public as being entitled to practice law, etc. Although in violation of the statute, the request for an injunction was refused because equity is concerned only with the protection of property, and to invoke the aid of equity, a plaintiff must show an actual or threatened invasion of property rights.

That case is decided on the basis that equity protects only property rights and not personal rights.

In Diamond v. Diamond, 372 Pa. 562 (1953), the court refused to grant an injunction against plaintiff's husband for committing adultery with Gussie Stein. The court said:

". . . courts of equity in Pennsylvania are concerned only where property rights are involved".

In Everett v. Harron, 380 Pa. 123 (1955), the court granted an injunction enjoining defendants from refusing to admit the plaintiffs to their public swimming pool in violation of The Penal Code of June 24, 1939, P. L. 872, providing for equal accommodations. Defendants contended that injunction would not lie because no property right of the plaintiffs was involved.

The court, overruling all prior decisions to the contrary, and after a discussion of them, held that equity will protect personal rights by injunction upon the same conditions upon which it will protect property rights by injunction. It adopted, in general, those conditions as set out in the case of Kenyon v. City of Chicopee, 320 Mass. 528, 70 N. E. 2d 241.

Those conditions, as announced in that case, and adopted in the case of Everett v. Harron, supra, are as follows:

(1) That unless relief is granted a substantial right of the plaintiff will be impaired to a material degree;

(2) That the remedy at law is inadequate;

(3) And that injunctive relief can be applied with practical success and without imposing an impossible burden on the court or bringing its processes into disrepute.

That case effectively changed the rule and in Pennsylvania a court of equity will protect personal rights by injunction under certain conditions.

In McGinnis v. Duggan, 112 Pitts. L. J. 48 (1964), the court refused to enjoin defendants from certain radio announcements broadcast by their station.

The court's decision was based on the finding that injunctive relief could not be applied with practical success, and without imposing an impossible burden

on the court, or bringing its processes into disrepute on the basis that it would cause the court to be a censor in election campaigns. Further, it would constitute the court a court of prior restraint and it would be acting in violation of article I, sec. 7, of the Pennsylvania Constitution, which provides, in part:

"The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty".

Applying the law of equity and the principles of the case of Everett v. Harron, supra, to the instant case, the plaintiff is not entitled to injunctive relief.

First, no substantial right of the plaintiff will be impaired to a material degree. As will be seen later in the discussion of defamation and of privacy, no rights of the plaintiff are involved here, only the rights of her deceased father, if any. Her name is not mentioned and her reputation is not involved, so that no right of reputation or privacy of hers in involved.

Second, the remedy at law is not inadequate; there has been no wrong done by defendant and plaintiff has suffered no injury so there is nothing to redress in this case. There being no injury, there is no remedy at law or in equity.

Third, injunctive relief cannot be applied with practical success in this case and without imposing an impossible burden on the court, or bringing its processes into disrepute.

Injunctive relief cannot be applied in this case with practical success because the court lacks jurisdiction to order the publisher and distributor, Random House, Inc., of New York, to change the publication, as they are without the jurisdiction and not parties to this suit. Also, to allow the judge of a court of equity to exercise previous restraint on the author would result in possibly as many different decisions in the juris-

diction of the courts of equity in Pennsylvania as the plaintiff would bring suits against the defendant within the jurisdiction.

Next, the exercise of previous restraint in a case of this type would impose an impossible burden on the court. It is true the courts are open to redress wrongs, but it would be impossible to exercise previous restraint over the voluminous publications now on the market.

If equity would undertake to decree corrections in a book for every person named therein who sought to obtain corrections satisfactory to his beliefs, a court of equity would be writing the book, not the author.

If everyone read a book as plaintiff read this one, by looking into the index for an ancestor's name, and on cursory examination started action to enjoin or correct the book, our bookshelves would either be empty or contain books written only by relatives of the subject.

The impossibility of the burden on the court is evidenced by the difficulty of determining the truth of the historical facts.

For example in the alleged libelous statement by defendant Stevens in his book, "Pennsylvania: Birthplace of a Nation" that "Henry Clay Frick reduced wages to approximately $1.60 per day". It could be found as a fact that the wages per day in 1886 ranged anywhere from $1.41 per day to $2.00 per day, or above. This was demonstrated by defendant by mathematical calculation. It was demonstrated by plaintiff by documentary evidence. Plaintiff's exhibit no. 32, The Connellsville, Pa., Courier, dated Friday, February 26, 1886, contains the statement on page 10 that "the average daily wages throughout the whole region is $1.41 per day". Further, in plaintiff's exhibit no. 31, The Connellsville, Pa., Courier, dated April 23, 1886, it is stated on page 3, "they (the miners) are now the highest paid of unskilled laborers in the country, for

the miner will be able to make $1.75 to $2.25 a day". Note that this statement was made on April 23, 1886 and that under the "new" wages they would be able to make up to $1.75 per day. Yet at page 20 of plaintiff's request for findings of fact and conclusions of law, item 16, plaintiff urges that Mr. Frick increased wages 10 percent in February and an additional 5½ to 8 percent in April, 1886, for a total wage increase before the newspaper article of 18 percent. Deducting the 18 percent wage increase from the $1.75 per day earned under the new wage scale, the wages previously paid would have been $1.44 per day. This amply demonstrates the difficulty, if not impossibility, for the judge of the court of equity to determine *the truth.* Yet on the basis of such determinations plaintiff urges the court to enjoin this excellent historical book in its entirety or to order retractions rather than proceed with the remedies available at law, either a criminal prosecution or a civil action for damages, if warranted.

We are all aware of the different versions of the recent assassination of President Kennedy. It is certain that there are many different versions and that each author believes his own to be the truth. Project the problem into the future, say 100 years from the date of the event, when some member of the Kennedy family might seek to enjoin publication of any one of the versions. If a court of equity would have the power to enjoin publication of such books, each equity court judge would be called upon to determine which version of the event was true and to restrain all others. This would place an impossible burden upon the court. This burden the court should not assume.

Accordingly, in a writing about any historical event, a single judge of a court of equity should not be the one to determine which version of the event is the

truth, to the exclusion and previous restraint of all others.

Next, to exercise jurisdiction in this type of case would bring the processes of the court into disrepute because this court cannot order a correction of the published and distributed book by Random House, Inc., over which we have no jurisdiction. To attempt to do so would be to attempt a vain and impossible thing. If this court should enter a decree ordering defendant to request corrections of this book by the publisher, Random House, Inc., and they fail or refuse to do so, defendant would be in contempt of this court. Yet, Random House, Inc., would still be free to publish and distribute the book in spite of the decree of this court.

Courts of equity, like courts of law, follow established precedents. We recognize the fact that equity is an elastic system; that its procedure is progressive and is capable of accommodating itself to the changing exigencies and demands of the age. If it were otherwise it could not so well have met the needs of our civilization. At the same time courts are not to usurp powers they do not possess. In a country which has constitutional guarantees of freedom of speech and of the press and of trial by jury, courts of equity should be slow to assume that they possess a power to deal with the publication of libels that the High Court of Chancery in England disclaimed: American Malting Co. v. Keitel, 209 Fed. 351, 353 (1913).

Even though equity will protect personal rights, by injunction, the instant case is not one in which equitable relief by injunction is available.

*Do the First and Fourteenth Amendments to the Constitution of the United States Prohibit Injunctive Relief Against Defamation?*

The instant case is not one for equitable relief by injunction for other reasons, one of which is freedom of speech and the press guaranteed by the First and

Fourteenth Amendments to the Constitution of the United States. The First Amendment of the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances".

Section 1 of the Fourteenth Amendment of the United States Constitution provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

These Constitutional prohibitions prevent an injunction issuing in this case. As early as the case of Willis v. O'Connell, 231 Fed. 1004 (1916), it has been held in the Federal courts that for the protection or vindication of his good name the citizen must be remitted to his remedy at law by a civil action, or criminal prosecution or both. The Constitution of the United States forbids injunction. It was held that it is not within the authority of any court, or of any other governmental agency, by any sort of censorship to abridge the right belonging to every man freely to speak and publish his sentiments.

Chancellor Kent is quoted as follows:

"It has accordingly become a constitutional principle in this country that every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and that no

law can be rightfully passed to restrain or abridge the freedom of speech or of the press".

As late as 1964 in the case of Kyritsis v. Vieron, 382 S. W. 2d 553 (Tenn. App.), the following citation from 11 Am. Jur., Constitutional Law §322, 1117, is cited with approval:

"Not only is the freedom of speech and of the press protected from enfringement by the legislative department, but it is also safeguarded from judicial abridgement. *An essential element of the liberty of the press is its freedom from all censorship over what shall be published and exemption from control in advance, as to what shall appear in print.* Consequently, it has been asserted that the right of freedom of speech and the press cannot coexist with the idea of preventing such freedom of speech or of the press by injunction". (Italics supplied.)

Near v. Minnesota ex rel. Olson, 283 U. S. 697-738, 75 L. Ed. 1357, is a landmark case on constitutional law. In that case Minnesota provided by statute for abatement, as a public nuisance, of any malicious, scandalous and defamatory newspaper. It was held that the statute imposed an unconstitutional restraint on publication. Mr. Chief Justice Hughes' opinion is worthy of quotation:

"The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as historically conceived and guaranteed. In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. . . . 'Every freeman has an undoubted right to lay what sentiments he pleases before the public; . . . but if he publishes what is improper, mischievous or illegal, he must take the consequence of his own temerity' ".

34

Articles One and Fourteen of the Constitution of the United States prohibit the granting of injunctive relief against alleged libel: Nann v. Raimist, 255 N. Y. 307, 317, 174 N. E. 690, 694, 73 A. L. R. 669; Willis v. O'Connell, supra; Mitchell v. Grand Lodge F. & A. M. 121 S. W. 178 (Tex. Civ. App.) ; Wolf v. Harris, 267 Mo. 405, 184 S. W. 1139; Hoxsey Cancer Clinic v. Marion B. Folsum, 155 F. Supp. 376.

*Does Article 1, Section 7, of the Constitution of the Commonwealth of Pennsylvania Prohibit Injunctive Relief Against Defamation?*

The Constitution of the Commonwealth of Pennsylvania also prohibits injunctive relief against defamation.

Article 1, sec. 7, of the Constitution of the Commonwealth of Pennsylvania, provides:

"The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communications of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases".

The Constitution of Pennsylvania is quite clear in that every citizen may freely speak, write and print on any subject, being responsible for the abuse of that

liberty. In civil actions at the suit of persons, either in a public or private capacity, the party is answerable to damages if he cannot verify the charges he has made: Runkle v. Meyer, 3 Yeates 518 (1803).

This article of the Constitution conveys the idea of liberty, unchecked as to what may be published, by anything save penalty. No one can possess the right to publish what he pleases, subject only to penalty for abuse, and at the same time be enjoined, restrained, and prevented by a court from doing so. If he is restrained, he does not have the right to publish: Empire Theatre Co. v. Cloke, 53 Mont. 183, 163 Pac. 107 (1917).

Freedom from previous restraint upon publication and the prevention of that restraint was the leading purpose in the adoption of the Constitutional provision: Commonwealth v. Reid, 144 Pa. Superior Ct. 569 (1941).

The right of a citizen freely to speak, write or print, is as broad as language can make it, with the single limitation that he shall be responsible for the abuse of that privilege: Briggs v. Garrett, 111 Pa. 404 (1886); Kraemer Hosiery Co. v. American Federation of Full Fashioned Hosiery Workers, supra; McGinnis v. Duggan, supra.

Public policy demands that the present state of the law continue and that, as has been decided: "Every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty" by criminal prosecution or civil action for damages.

Considering the enormity of the problem of censorship and prior restraint on publication, as well as the unfairness of it to the citizenry, the framers of our Constitution were wise in their decision to prevent censorship and prior restraint and allow free speech and free press, with accompanying punishment for abuse of the right by criminal prosecution or civil

action for damages. An enlightened public opinion will take care of those who handle the truth carelessly or abandon it.

Article I. sec. 7, of the Constitution of the Commonwealth of Pennsylvania, prohibits injunctive relief in the instant case.

*Is the Book, "Pennsylvania: Birthplace of a Nation"*
*Defamatory of Henry Clay Frick or Plaintiff,*
*Helen C. Frick, Under the United States Constitution?*

Recent decisions of the United States Supreme Court in New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), and subsequently, require closer examination of the constitutional question involved in defamation actions: Fegley v. Morthimer, 204 Pa. Superior Ct. 54 (1964); Clark v. Allen, 415 Pa. 484 (1964); Fox v. Kahn, 421 Pa. 563 (1966); Brubaker v. Reading Eagle Company, 422 Pa. 63 (1966).

The New York Times case decides the question whether the freedom of speech and of the press guaranteed by the First and Fourteenth Amendments of the Constitution of the United States limit state power to award damages to a "public official" for defamatory falsehood relating to his "official conduct". The Supreme Court of the United States held that the amendments do limit such state power unless the plaintiff "proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not".

The court further held that the limitation applied to state law regardless of the origin: the common law or statute or a combination of the two.

"Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid re-

strictions on their constitutional freedoms of speech and press. It matters not that the law has been applied in a civil action and that it is common law only, though supplemented by statute. See e. g., Alabama Code, Tit. 7, §§908-917. The test is not the form in which state power has been applied, but, whatever the form, whether such power has in fact been exercised": New York Times Co. v. Sullivan, supra.

Nor is there a distinction made because, as is the case here, the author received consideration for the writing.

". . . we hold that if the allegedly libelous statements would otherwise be constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement": New York Times Co. v. Sullivan, supra.

The court indicated in a footnote (n. 23) that it did not resolve or determine how far down into the lower ranks of government employes the "public official" designation would extend for purposes of the rule, or otherwise specify categories of persons who would or would not be included. Nor did they determine the boundaries of the "official conduct" concept.

Pennsylvania has so far applied the rule of New York Times Co. v. Sullivan to a Councilman, in Fegley v. Morthimer, supra; a Senator, in Clark v. Allen, supra; and a District Attorney, in Fox v. Kahn, supra; and Brubaker v. Reading Eagle Company, supra.

In Clark v. Allen, supra, the Pennsylvania court held that if freedom of the press or speech collides or conflicts with libel and there exists any substantial doubt on the question of which shall apply, the protection of our country is far more important than the protection of the reputation of a public official *or a person in public life.*

In Time, Inc. v. Hill, 385 U. S. 374, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967), the rule of New York Times Co. v. Sullivan was applied and it was held that the "guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government". Further, "A broadly defined freedom of the press assures the maintenance of our political system and an open society".

In Pauling v. Globe-Democrat Publishing Company, 362 F. 2d 188 (1966), Dr. Linus Pauling, a well known scientist, recognized by the United States Government in World War II, the 1954 Nobel Prize winner in chemistry, and holder of the Nobel Peace Prize, sought to prevent further detonation of nuclear weapons by his speech, writings, and actions. Dr. Pauling brought an action against the defendant for libel based on editorial comment on his actions in connection with the issues on nuclear weapons. It was held that the New York Times Co. v. Sullivan rule applied and Dr. Pauling could not recover for libel in the absence of malice, because he had projected himself into the arena of public policy, public controversy, and pressing public concern. The court found that by his statements and actions he was projecting himself into the arena of public controversy and into the very vortex of the discussion of a question of pressing public concern. He was attempting to influence the resolution of an issue which has a profound effect on public policy and which was public and controversial.

The rule of New York Times Co. v. Sullivan was thus broadened to include a private individual who projects himself into the arena of public controversy and into the vortex of the discussion of a question of pressing public concern. The concept of "public official" and "official conduct" was broadened. This was decided on the basis that there is no rational distinction to be

found between a public official and a private citizen who injects himself into public issues.

"We . . . feel that a rational distinction cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of national policy will be less important to the public interest than will criticism of government officials. A lobbyist, a person dominant in a political party, the head of any pressure group, or *any significant leader* may possess a capacity for influencing public policy as great or greater than that of a comparatively minor public official who is clearly subject to [the] New York Times [rule]. It would seem, therefore, that if such a person seeks to realize upon his capacity to guide public policy and in the process is criticized, he should have no greater remedy than does his counter-part in public office": Pauling v. Globe-Democrat Publishing Company, supra. (Italics supplied.)

The only difference between the activities of Dr. Pauling and those of Henry Clay Frick are in time, which should not determine the case or alter the principle or rule of law. Although Dr. Pauling's activities were more recent, Henry Clay Frick's activities being between the Civil War and 1919, the same right of criticism of Dr. Pauling will exist 50 years hence as it exists now, because of his activities. Therefore, the right of criticism of Henry Clay Frick should exist 50 years after his death the same as it would have during the period of his activities.

There is no question but that Henry Clay Frick injected himself into the vortex of public issues. Those public issues were monopolies, labor-management relations, a strike and government investigation of industrial conditions.

Henry Clay Frick amassed millions in industry—in coal, coke and steel. He was involved in the importation of foreign labor, the company houses, the company

store with his own currency issued, numerous strikes, and particularly the Homestead Strike, an investigation by a Judiciary Committee of the United States Congress, Grand Jury proceedings in the State courts and numerous investigations by the Department of Internal Affairs of the Commonwealth of Pennsylvania.

That all of those matters were of public interest is evidenced by the fact that our government now regulates all of those subjects in some manner. Particularly of public interest are working conditions of the laboring man, monopolies, labor unions and strikes. There is even now governmental regulation of strikes and enforced cooling-off. There is now governmental regulation of monopolies. There is now governmental regulation of housing. All these matters, in which Henry Clay Frick sought to determine policy, and did determine policy, were matters of public interest and public concern. The courts cannot restrain writings on the historical development of these public issues. They are part of the heritage of every citizen and each is entitled to know them. We cannot proclaim only the virtues of Henry Clay Frick and perpetuate them as his memory, and at the same time allow previous restraint or damages in the absence of malice, for those who describe or debate the full story. It is admirable to perpetuate his memory, but the public is entitled to full knowledge of his activities, not only his philanthropies. It is conceded that Henry Clay Frick was philanthropic after he had amassed his millions in the golden age of the titan of industry in Pennsylsylvania. But it is also true that one does not amass millions in several decades, without being somewhat of a stern, brusque, autocratic industrialist and businessman.

It is necessary for the public, in order to have an understanding of the relationship of industry and

labor today, to understand the history and development of the issues from the beginning, that is, from the use of immigrant labor, long working hours, company stores, company houses and the development of the strike as a weapon of labor. No person should be allowed to suppress writings on those subjects today, in the absence of malicious abuse of the privilege.

No better example of the need for the study of history can be given than in the study and development of the law. An understanding of the law today is based on an understanding of the history of its development. The issues and conflicts which developed the law to its present state and the reason for changes made over the years is essential to an understanding of the law today. Likewise, in the fields of labor and industry, an understanding of past conflicts and issues is essential to an understanding of its present state and present conflicts. For enlightenment, the citizenry must understand the days of "might makes right." Those were the days of little government control, little taxation, and unorganized labor. The citizenry must also understand the history of company stores and housing, long hours of work, and abuse of the strike by labor. Understanding of that history will make for a better understanding of present conflicts and is in the public interest, comparable to the public interest in nuclear issues and controls.

The defendant in writing about Henry Clay Frick is entitled to constitutional protection based on the cases of New York Times Co. v. Sullivan, supra, and Pauling v. Globe-Democrat Publishing Company, supra. An action for libel would not lie in the absence of the showing of malice, that is, knowledge that the statements were false, or reckless disregard of whether they were false or not. There is no proof of malice in this case and accordingly an action for libel would not

lie. Certainly in the absence of proof of malice no injunction can issue.

### Is the Book, "Pennsylvania: Birthplace of a Nation" Defamatory Under Pennsylvania Law?

Plaintiff seeks to enjoin the book, "Pennsylvania: Birthplace of a Nation" because it is defamatory under Pennsylvania law. It is asserted that it is libel to blacken the memory of one who is dead. It is true that some earlier cases define libel as a "malicious publication, expressed either in printing or writing, or by signs and pictures, tending either to blacken the memory of one who is dead, or the reputation of one who is alive, and expose him to public hatred, contempt or ridicule". However, in all those cases the statement as to the blackening of the memory of one who is dead was dicta. Actually, on examination, the old definition is not understandable or workable. How can one expose one who is dead to public hatred, contempt or ridicule? Who may bring the action?

Pennsylvania has held that the test of §559 of the Restatement of Torts is to be applied for defamation and by implication the old definitions are superseded by the Restatement, Torts §559, wherein a defamatory communication is defined as follows:

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him".

It is the function of the court, in the first instance, to determine whether the communication is capable of a defamatory meaning: Restatement, Torts §614(1). *In so doing, the appropriate test is that set forth in Restatement, Torts §559:* Birl v. Philadelphia Electric Co., 402 Pa. 297 (1960), at 303; see also Clark v. Allen, 415 Pa. 484 (1964); and Cosgrove Studio and Camera Shop, Inc. v. Pane, 408 Pa. 314 (1962).

The Pennsylvania courts have not specifically adopted §560 of the Restatement of Torts on defamation of deceased persons, which is as follows:

"One who falsely, and without a privilege to do so, publishes defamatory matter of a deceased person is not liable either to the estate of such person or to his descendants or relatives".

However, by implication, in deleting the words "to blacken the memory of one who is dead" from the definition of defamatory communication in §559, §560 of the Restatement of Torts is adopted.

Even if the plaintiff could prove that the defendant published defamatory matter regarding Henry Clay Frick, neither his estate, which is not a party to this suit, nor his descendants or relatives, including plaintiff, could recover.

A relative has no right of action for alleged defamation of a decedent: Insull v. New York World-Telegram Corp., 172 F. Supp. 615 (Illinois) ; Rose v. Daily Mirror, Inc., 284 N. Y. 335, 31 N. E. 2d 182; Bradt v. New Nonpareil Co., 108 Iowa 449, 79 N. W. 122; Sorenson v. Balaban, 42 N. Y. Supp. 654; Wellman v. Sun Printing & Pub. Ass'n., 21 N. Y. Supp. 577; Saucer v. Giroux, 54 Cal. App. 732, 202 Pac. 887.

Plaintiff cites §560 of the Restatement of Torts as authority for the proposition that she is defamed. This section concerns defamation of deceased persons and asserts that there is no liability for publishing defamatory matter of a deceased person. In the comment, it is stated that words concerning a dead person may, however, constitute defamation of a living person under §564, comment (e), of the Restatement. Section 564 (e) of the Restatement of Torts states:

"*Statements referring to one person but defaming another*. A statement may be published of a third person under such circumstances as to be defamatory of another not named or described." (Italics supplied.)

However, in each of the illustrations given, the statement about one person named therein imputed personal misconduct to a person related to the other, specifically adultery. They are clearly inapplicable as is §564(e) of the Restatement of Torts because nowhere is there any misconduct imputed to Miss Helen C. Frick, plaintiff. The only statements in the book concerning Henry Clay Frick are in regard to his business dealings during this era of industrial growth in Pennsylvania. Nothing is mentioned of his personal life or of the life of plaintiff, Helen C. Frick, and therefore there is nothing defamatory of her in the book. The references in the book to Henry Clay Frick do not expose plaintiff, Helen C. Frick, to ridicule, contempt, hatred, nor do they degrade her character. Miss Frick's feelings may have been hurt but she has not been defamed and therefore does not have a cause of action for defamation or to enjoin defamation.

In other respects plaintiff has not proven defamation and therefore injunction against defamation will not lie.

The burden of proof in an action for defamation is set out in Pennsylvania by the Act of August 21, 1953, P. L. 1291(1), and is similar to the burden of proof set out in the Restatement, Torts §613, and is as follows:

*"BURDEN OF PROOF*

"(1) In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised,

"(a) the defamatory character of the communication;

"(b) its publication by the defendant,

"(c) its application to the plaintiff.

"(d) the recipient's understanding of its defamatory meaning,

"(e) the recipient's understanding of it as intended to be applied to the plaintiff.

"(f) special harm resulting to the plaintiff from its publication,

"(g) abuse of a conditionally privileged occasion.

"(2) In an action for defamation, the defendant has the burden of proving, when the issue is properly raised,

"(a) the truth of the defamatory communication,

"(b) the privileged character of the occasion on which it was published;

"(c) the character of the subject matter of defamatory comment as of public concern".

Plaintiff has failed to prove the defamatory character of the communications: Restatement, Torts §613 (1) (a). The statements claimed by plaintiff to be defamatory are not at all defamatory, but are expressive of conditions then existing. Most of the matters referred to in the alleged defamatory statements are matters of common knowledge to any public school graduate and certainly known to anyone with any historical interest. They are almost so well known and documented as to be the subjects of judicial notice. It is ironic that, considering Henry Clay Frick's personality, as recorded by history, his daughter seeks to enjoin these passages in the book, yet Henry Clay Frick himself, were he here, would be proud of them.

It is not defamatory to say that a man has built a monopoly in his business; that he was successful in beating down efforts at unionization; that he made extensive use of immigrant labor; that he cut wages; that he extracted longest hours of work physically possible; that he broke the power of the union; that he was stern, brusque, autocratic; or that he caused a strike. All these are statements that are nondefamatory and mostly so conceded by plaintiff's counsel.

In McAndrew v. Scranton Republican Publishing Company, 364 Pa. 504 (1950), it was stated:

". . . annoyance does not constitute defamation.

"It would doubtless be very annoying for a man to be charged with bigotry of any kind, yet it has been held that for a man to be charged with such bigotry is not defamation".

All the statements about Henry Clay Frick were attributed and attributable to the "shrewd business leaders" of the era.

Plaintiff complains particularly that the statement that Henry Clay Frick cut wages to approximately $1.60 per day is offensive because it does not state the number of times Henry Clay Frick increased wages or the amounts thereof. However, that was not the theme of the book in this period of struggle between industry and unorganized labor and non-governmental control.

Plaintiff has also failed to prove the application of the alleged defamatory statements to her: Restatement, Torts §613(1)(c). The statements were applicable to the business dealings of Henry Clay Frick, not even applicable to his personal life, and in no respect applicable to plaintiff, Helen C. Frick.

By failing to prove the defamatory character of the communication and its application to plaintiff, plaintiff has failed to prove section 613(1)(e), the recipient's understanding of its defamatory meaning and the recipient's understanding of it as intended to be applied to her.

Plaintiff has also failed to sustain the burden of proof and prove special harm resulting to plaintiff from the publication of the statements: Restatement, Torts §613(1)(f). At most, Miss Frick states that her feelings have been hurt and she is emotionally distressed by the publication. This is a matter of invasion of privacy and not defamation. She admits that

neither her reputation nor the reputation of decedent, Henry Clay Frick, have been affected by the book, but at most that they might at some time in the future. This does not meet the burden of proof.

Defendant has the burden of proving and has proven the following:

(a) The truth of the alleged defamatory communications;

(b) The privileged character of the occasion on which they were published;

(c) The character of the subject matter of the defamatory comment as of public concern.

We find the alleged defamatory communications are true and are evidenced by historical writings. This can best be demonstrated by the evidence on the record that a statement that wages had been reduced to as low as $1.41 a day to $2.00 per day would be true. This court has found as a fact that wages had been reduced to $1.41 per day in 1886.

Likewise, the statement that the longest hours of work possible were extracted from the laborers is subject to a finding that it is true that 8 hours of work in a coal mine would be the longest hours of work physically possible. All these matters are variable.

". . . in many areas which are at the center of public debate 'truth' is not a readily identifiable concept, and putting to the pre-existing prejudices of a jury the determination of what is 'true' may effectively institute a system of censorship. Any nation which counts the *Scopes* trial as part of its heritage cannot so readily expose ideas to sanctions on a jury finding of falsity. See Cantwell v. Connecticut, 310 U. S. 296, 310. 'The marketplace of ideas' where it functions still remains the best testing ground for truth": Mr. Justice Harlan in Time, Inc. v. Hill, supra.

It is also true that Henry Clay Frick was a cause of the Homestead Strike. There were other contributing

causes, to be sure, but it is certainly a true fact of history that Henry Clay Frick contributed to the happening of the strike, and to the bloodshed.

Further, there is ample evidence that he was stern, brusque and autocratic.

Defendant has also proven that his writing was conditionally privileged and there is no proof of abuse of the privilege by the plaintiff or the existence of malice.

A privileged communication is one made on a proper occasion, from a proper motive, in a proper manner and based upon reasonable or probable cause: O'Donnell v. Philadelphia Record Company, 356 Pa. 307 (1947); Bausewine v. Norristown Herald, Inc., 351 Pa. 634 (1945); McRae v. Afro-American Co., supra.

The rule is that a communication made in good faith upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, public or private, either legal, moral or social, if made to a person having a corresponding interest or duty, is privileged: Briggs v. Garrett, supra; Williams v. Kroger Grocery & Baking Company, 337 Pa. 17 (1940); Rankin v. Phillippe, 206 Pa. Superior Ct. 27 (1965).

Defendant, as an outstanding historian and Chairman of Pennsylvania Historical Commission, had an interest in the subject matter of this publication. The occasion for the publication was the need for such a book.

That the recipients have an interest is evidenced both by the necessity of history books and the interest of the public in the background and development of the Commonwealth, and by the interest and understanding of the public and citizenry in the history of industrial and labor relations. Those interests were evident in the era about which the defendant wrote and they are of interest today.

Defendant has also proven that the character of the subject matter of the alleged defamatory comment is a public concern. An enlightened public opinion and citizenry is the aim of our government today just as when the Constitution was framed. This matter is one of public concern. Plaintiff by her efforts to perpetuate the memory of her father contributes to the creation of public interest in the matter and helps make it a matter of public concern.

Plaintiff has not proven defamation by defendant under Pennsylvania law.

### *Does the Book, "Pennsylvania: Birthplace of a Nation" Invade the Privacy of Helen C. Frick or Intentionally Inflict Mental Distress Upon Helen C. Frick?*

Although plaintiff testified that she suffered emotional distress as a result of the writings of defendant, it is nowhere asserted in the complaint that she has a cause of action for invasion of her privacy or for intentionally causing severe emotional distress. Her complaint alleges only that she has unjustly suffered and will continue to suffer a loss of reputation and public esteem. We dispose of the matter by finding that there is no invasion of the privacy of the plaintiff and there is no intentionally causing of severe emotional distress to the plaintiff: Forster v. Manchester, 410 Pa. 192 (1963); Bennett v. Norban, 396 Pa. 94 (1959).

### *May Any Relief Be Granted?*

Plaintiff concedes that since the publisher and distributor, Random House, Inc., is not a party to this suit, an injunction cannot be issued against it. It is further conceded that defendant, Sylvester K. Stevens, is not publishing and distributing the book. With these concessions, plaintiff asks for such other relief as may be granted by the court and asks that Dr.

Stevens be ordered and directed, by decree, to *request* Random House, Inc., to withhold further publication until corrections are made in the book and make *requests* for such corrections. This we cannot do for two reasons.

First, there is no evidence in the record that Random House, Inc., would make corrections if requested by Dr. Stevens or that it could be compelled to do so by this court. The contract between the parties is not in evidence and the rights of the respective parties to the contracts are not in the record. This court of equity would be doing indirectly, through Dr. Sylvester K. Stevens, what plaintiff has the right to do directly by action in New York against the one publishing and distributing the book, if her position has merit.

The second reason this court will not issue such a decree is that Dr. Stevens has written what he believes to be true and what this court believes to be true. No such decree will issue and no relief may be granted. Plaintiff's complaint must be dismissed.

### DECREE NISI

And now, May 25, 1967, at 8:45 a..m. (E.S.T.), plaintiff's complaint in equity is dismissed.

The prothonotary of Cumberland County is directed to file this opinion, enter the within decree nisi, give notice to the parties or their counsel of record as provided by the rules of equity practice in Pennsylvania, and unless exceptions are filed to this decree nisi within 10 days after said notice, this decree shall be entered as a final decree by the prothonotary.