## Commonwealth *v.* Palms, Appellant.

Argued March 12, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, PARKER, RHODES and HIRT, JJ.

*Hayden C. Covington,* with him *Conrad A. Falvello* and *Joseph F. Rutherford,* for appellant.

*Harvey F. Heinly,* with him *C. Wilson Austin,* Assistant District Attorney, and *James F. Marx,* District Attorney, for appellee.

OPINION BY KELLER, P. J., October 2, 1940:

This is an appeal by Richard B. Palms from an order of the Court of Quarter Sessions of Berks County refusing to allow an appeal from the judgment of a justice of the peace, upon a summary conviction for disorderly conduct.

Article V, section 14 of the Constitution of Pennsylvania provides with respect to summary convictions: "In all cases of summary conviction in this Commonwealth,......either party may appeal to such court of record as may be prescribed by law, *upon allowance of the appellate court or judge thereof upon cause shown."* (Italics supplied).

By the Act of April 17, 1876, P. L. 29, the court of quarter sessions[1] of the county in which such magistrate resides, or court not of record is held, is prescribed as the court of record to which appeals from summary convictions may be taken, upon allowance of said court, or any judge thereof, upon cause shown.

A statute which attempts to grant an appeal from a summary conviction without allowance by the prescribed court of record upon cause shown violates the provision of the Constitution above quoted and is unconstitutional: *Com. v. Luckey,* 31 Pa. Superior Ct. 441; *Com. ex rel. Marsh v. Lindsey,* 130 Pa. Superior Ct. 448, 451, 198 A. 512.

An appeal from a summary conviction is not a matter of right (*Com. v. Eichenberg,* 140 Pa. 158, 21 A. 258), and an appeal from an order of the court of quarter sessions refusing to allow an appeal brings up the record only by way of *certiorari:* Ibid. p. 160; *Com. v. Stewart,* 137 Pa. Superior Ct. 445, 9 A. 2d 179; *Com. v. Climenti,* 89 Pa. Superior Ct. 195, 197. It was not intended that an *appeal proper* should lie, as of right, to the Supreme Court—or to the Superior Court, since its creation—

[1]The County Court, in Allegheny County, Act of May 5, 1911, P. L. 198, sec. 6(c).

from the action of the court of quarter sessions upon a judgment which could be appealed to that court only upon allowance, for cause shown.

We said in *Thompson v. Preston,* 5 Pa. Superior Ct. 154, 157, speaking of the 'cause shown' which should move the court of quarter sessions, or a judge thereof, to allow an appeal: "Ordinarily an appeal should not be permitted, if the party desiring it has had an opportunity to fully and fairly present his case before the magistrate, unless a doubtful legal question is involved, or there is something to indicate oppression, corruption or disregard of law on the part of the magistrate, or after-discovered evidence which would justify a new trial, under the well-known rules relating to new trials for that cause. Neither Art. V, sec. 14 of the Constitution, nor the act of 1876, which was passed to carry it into effect, contemplates that an appeal should be allowed merely because the party desiring it is dissatisfied with the result of the trial before the magistrate, as is the case with most defeated litigants, and cheers himself with hopes of better success in the next encounter."

It follows that if the matter in dispute was one of *fact,* as to which the party desiring the appeal had full opportunity to present his side, and he received fair treatment from the magistrate and was not the victim of oppression, bias or corruption at the latter's hands, an appeal should ordinarily not be allowed, unless the losing party in his petition for appeal shows evidence, discovered since the trial, which could not by the use of reasonable diligence have been obtained at the trial, which is not merely corroborative or cumulative, or merely impeaching the credibility of a witness, and is of such a character as would likely result in a different finding if an appeal were granted (*Com. v. Mellon,* 81 Pa. Superior Ct. 20, 25).

On the other hand, if a legal question is presented as the point in issue, as to which there is reasonable doubt

as to its solution, and especially if a constitutional question is involved, then an appeal should be allowed; for a magistrate, or justice of the peace, is not usually learned in the law and has not had the training or legal education requisite to pass upon doubtful legal and constitutional questions.

On careful consideration, we are of opinion that the present case falls within the latter category and that an appeal should have been allowed by the learned President Judge of the Court of Quarter Sessions; not that we accept or follow the extreme views presented by counsel for appellant, but we feel that a legal controversy which, along related lines, was worthy of the consideration of the Supreme Court of the United States might properly be heard on appeal by the court of quarter sessions.

Article I of the amendments to the Federal Constitution provides: "Freedom of Religion, Speech and Press. *Congress* shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press;......" The provisions of the 14th Amendment: "Privileges of Citizenship. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws," have been extended far beyond the purposes in view at the time of its submission (1866) and adoption (1868) and, in effect, have been held to make the provisions of the first ten amendments, which constitute a sort of Bill of Rights, applicable to the States. (Italics supplied).

Our State Constitution provides, in Article I, Declaration of Rights—section 3. Rights of Conscience. Freedom of Religious Worship—"All men have a natural

and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience and no preference shall ever be given by law to any religious establishments or modes of worship"; and in section 7 of Article I: "Freedom of the Press......The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, *being responsible for the abuse of that liberty."* (Italics supplied).

It seems clear to us that what the founders of the Republic—and also the framers of our State Constitution—had chiefly in mind, as respects freedom of religion, was the prohibition of a State or Established Church or Religion, and any interference with the right of freedom of conscience and religious belief—the right to attend or to stay away from places of worship, to support or to refrain from supporting any church or ministry, and to have all religious establishments or modes of worship treated on an equality and without any preference of one over another.

This does not mean that under the shield or protection of alleged religious belief or worship, a sectarian may escape punishment for acts or conduct declared by the legislature to be inimical to the peace, good order and morals of society. A crime is none the less so, nor less odious, because sanctioned by what some particular sect may designate as religion: *Davis v. Beason,* 133 U. S. 333, 342, 345. This was definitely settled in the case of *Reynolds v. United States,* 98 U. S. 145, 164,

165-167, where it was decided that the practice of polygamy, although enjoined upon the Mormons as a tenet of their religion by a revelation given to their Prophet, Joseph Smith, was punishable as a crime forbidden by law. Chief Justice WAITE, speaking for the Court, drew the distinction between *opinions* and *actions,* and held that by the First Amendment, "Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order" (p. 164). He said, further, on page 166: "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?"

If some sectarian should carry his religious belief in the community of property to such an extent as to disregard all distinction between *'meum* and *tuum',* and appropriate to his own use his neighbor's property, he would be punishable in our criminal courts; and if some modern hierarchal judge should emulate Jephthah, Judge of Israel, and vow the sacrifice of whatsoever came forth from the doors of his house to meet him in the event of the successful outcome of one of his religious battles, if he carried the vow into effect by a burnt offering of his daughter, and was found sane, he would be punished for his criminal act, and his reliance upon his religious oath would not avail him.

To phrase it another way, while freedom of religious *belief* is a constitutional right, freedom in the *mode of expressing* that belief is not a constitutional right. It

is subject to the condition that such expression shall not be by way of acts inimical to the *peace, good order* and *morals* of society, as determined by the legislature and the courts. See *Minersville School District v. Gobitis,* 310 U. S. 586, FRANKFURTER, J. (June 3, 1940).

This may seem to be a digression but it leads up to the facts in this case.

At 8:30 o'clock in the morning of Sunday, October 29, 1939, a crowd numbering well over one hundred men and women, collected from various surrounding districts, calling themselves Jehovah's Witnesses, came to Kutztown, Berks County, a borough having less than 3000 inhabitants. They had come there on several prior occasions, the last one the evening before—October 28th —and the burgess and chief of police had received complaints of their annoying the people of the borough by their noisy conduct and persistent attempts to enter the homes of citizens of the borough. On this occasion they staged a parade on the sidewalk of the principal street, carrying placards and sandwich boards, bearing the words, "Religion is a Snare and a Racket" and were accompanied by a truck with a sound device and magnifier, which caused an unseemly racket. They rang doorbells, and when denied admittance at the front door, went around to the back and entered there; in some instances, they forced their way into houses and would not leave although requested to do so, and at one home a young woman had to call her father before the intruder would leave. They were trying to sell literature of the Watch Tower Bible and Tract Society and to play phonograph records attacking other religious beliefs. They came around as many as five times to certain homes. When the burgess and chief of police requested this appellant, who seemed to be directing the movement, to stop these practices, he refused and said he would continue to 'molest' the people; that he obeyed no law but that of Jehovah.

On November 1, complaint was made charging the appellant, Richard B. Palms, and three others with disorderly conduct (Act of June 24, 1939, P. L. 872, sec. 406),[2] and following separate hearings before the justice of the peace, as requested by Palms, he was convicted *and the others were discharged.* He was sentenced to pay a fine of $10, and costs of prosecution, and in default thereof to undergo imprisonment in the Berks County Prison for a period of ten days. He applied by petition to the court of quarter sessions for an appeal, which was refused. This appeal followed.

It will be noted that the defendant did not proceed by way of certiorari to the court of *common pleas;* hence we are not concerned with alleged errors in the form of the complaint or the transcript of the justice. He chose the remedy by appeal to the court of quarter sessions, which constituted a waiver of *formal* defects in the proceedings before the justice.

We are of opinion that if it had been proved before the justice of the peace that the *appellant* had been guilty of the conduct just recited in the foregoing abstract, or that he had directed and ordered the doing of the acts above recited, or if it had appeared, as it did in the case of *Com. (Borough of Homestead) v. Hessler,* 141 Pa. Superior Ct. 421, 15 A. 2d 486, that at the hearing he had assumed responsibility for such acts and conduct, there would be sufficient to uphold the conviction, and we would affirm the action of

---

[2] "Disorderly Conduct.—Whoever wilfully makes or causes to be made any loud, boisterous and unseemly noise or disturbance to the annoyance of the peaceable residents near by, or near to any public highway, road, street, lane, alley, park, square, or common, whereby the public peace is broken or disturbed or the travelling public annoyed, is guilty of the offense of disorderly conduct, and upon conviction thereof in a summary proceeding, shall be sentenced to pay the costs of prosecution and to pay a fine not exceeding ten dollars ($10), and in default of the payment thereof. shall be imprisoned for a period not exceeding thirty (30) days."

the court below, notwithstanding our view that an appeal might well be allowed in cases involving doubtful legal and constitutional questions; for in such event, appellant would have suffered no real harm. We are of opinion that the facts in evidence, if proved to have been done by the defendant, or under his orders and direction, distinguish the case from the recent decisions of the Supreme Court of the United States in *Schneider v. State (Town of Irvington)*, 308 U. S. 147, 157, and *Cantwell v. State of Connecticut*, 310 U. S. 296 (May 20, 1940). We have here involved not only more noisy and disturbing disorderly conduct[3] than was present in those cases, but we have an additional element not present in them, viz., the violation by the appellant and his associates of a constitutional right much older and just as fundamental as the right of freedom of conscience or the right of freedom of speech—the right to be secure in one's home from unwanted intrusion. Mr. Justice MURPHY had it in mind when in his recent opinion in *Thornhill v. State of Alabama*, 310 U. S. 88, and *Carlson v. People (California)*, 310 U. S. 106, decided April 22, 1940, he recognized the power and duty of the state to take steps to preserve the peace and *protect the privacy* and the property of its inhabitants. Centuries before freedom of conscience and freedom of speech were established in England it was the proud boast of an Englishman that his home was his castle and that as long as he obeyed the law, the King and his army could not enter it against his will. That right is implied in both our Federal and State Constitutions in the provisions against *unreasonable search and seizure* even by law offi-

---

[3] The Act of June 24, 1939, P. L. 872 (Sec. 406) does not limit the disorderly noise or disturbance to such as is committed on the public highways. It also includes such unseemly noise or disturbance as constitutes an "annoyance of the peaceable residents *nearby.*"

440

cers.  We had it in mind when we said in *Pittsburgh v. Ruffner,* 134 Pa. Superior Ct. 192, 199, 4 A. 2d 224, "This appellant is perfectly free to worship God according to the dictates of his own conscience, separately or with his family and co-religionists, in his home or theirs, and in church, chapel, assembly or other gathering place.  But the very clause of the Constitution which protects him in his religious worship, protects others from having *his* religious tenets and beliefs thrust upon *them, against their will, in their homes* and offices." Nor does the right of free *speech* justify the unwanted intrusion of the speaker into the homes of others to give voice to his speech.  There is a reasonable limit to the right, and it ends at the door of a home whose residents do not want the speaker to enter; just as its protection is lost by blasphemy, disorderly conduct, libel, slander, etc.

But the difficulty with this transcript is that it does not show that these highly objectionable and disorderly matters were done or directed by this appellant.  The fault may lie with the justice's lack of knowledge of what was essential to be *proved* for a conviction.  Had the appellant gone into the common pleas by certiorari, we would have been obliged to set aside the conviction. As it is, we are of opinion that an appeal should have been allowed.

The order of the court below refusing to allow an appeal is reversed and the record is remitted with directions to allow an appeal and proceed to a hearing.