## Commonwealth *v.* Reid et ux., Appellants.

Argued March 11, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES and HIRT, JJ.

*Theodore A. Epstein,* with him *Hayden Covington, Joseph F. Rutherford* and *Chase & Swope,* for appellants.

*John C. Arnold,* with him *D. Edward Chaplin,* Borough Solicitor, and *Dan P. Arnold,* for appellee.

OPINION BY KELLER, P. J., June 30, 1941:

These are appeals from the judgments of the Court of Quarter Sessions of Clearfield County, sustaining the summary conviction of the appellants by the Burgess of Clearfield Borough for violation of ordinance No. 498 of said borough prohibiting the selling, *inter alia,* of magazines and periodicals on the public streets, unless the person so doing had first taken out a license from the burgess and paid the required fees. The material portions of the ordinance—which was ordained and enacted August 7, 1939— are printed in the margin.[1]

_____

[1] —"ORDINANCE No. 498. Referring to canvassing from house to house, or on the streets, selling, offering for sale, or soliciting orders for goods, wares, merchandise, medicine, etc., by samples or otherwise, and regulating the same.

"Section 1. Be it enacted by the Burgess and Town Council of the Borough of Clearfield in Council regularly assembled, that from and after the passage of this ordinance every person canvassing from house to house, or on the public streets in the Borough of Clearfield, Pennsylvania, for the purpose of selling or soliciting orders for, by samples or otherwise, meat, oysters, fish, vegetables, teas, coffees, fruits, groceries, printing, stationery, books, wall paper, paint, magazines, periodicals, brushes, polishes, confectionery, drugs, plumbing, cosmetics, jewelry, beverages, furniture, automobiles, trucks, accessories, airplanes, photographs, or the making, developing, printing, finishing, mounting, framing, selling and delivery of photographs to private houses, by wholesale or retail, all peddlers of goods, wares and merchandise of any kind, all transient dealers or hawkers selling on the public highways, shall take out a license from the Burgess, and pay the fees hereinafter required before selling or offering for sale anything as aforesaid within the Borough.

"Provided, however, that the provisions of this ordinance shall not apply to sales to dealers, merchants and manufacturers of goods and supplies to be used in trade by said dealers, merchants and manufacturers, nor to persons selling milk, bread, nor to

The undisputed facts in the case are that the appellants who are husband and wife, were arrested on August 10, 1940 for selling and offering for sale, at the corner of Second and Market Streets and Third and Market Streets respectively, in the Borough of Clearfield, periodicals or magazines called 'The Watch Tower' and 'Consolation' for five cents a copy, without first taking out a license as required by the ordinance. These magazines or periodicals were carried by each appellant in a canvas bag container marked 'The Watch Tower and Consolation, 5c a copy.' On the cover of The Watch Tower appeared the words, "Yearly subscription price U. S. $1.00." Appellants testified at the hearing that they did not *sell* the magazines, but gave them to any one who made a *contribution* for them; that "[they] gave away more for nothing than [they] got contributions for"; that none had been *sold* by them for money when the arrests were made, but they were offering them in connection with their preaching or teaching the tenets of their religious sect, 'Jehovah's Witnesses.'

The court below found them guilty of violating the ordinance by selling or offering for sale, on the public streets of the borough, certain magazines or periodicals without having previously obtained a license as required by the ordinance; and fined each of them $10 and costs of prosecution, the same penalty previously imposed by the burgess. Appeals were then taken to this court.

Recent pronouncements of the Supreme Court of the United States require that the judgments be reversed. They are found in *Lovell v. City of Griffin*, 303 U. S. 444; *Hague v. C. I. O.*, 307 U. S. 496; *Schneider v. State, (Town of Irvington)* 308 U. S. 147, 157; *Cant-*

persons selling the products of their land ......" The fees, as fixed by section 2, vary from $5 to $10 per day, and $100 to $200 per month, where vehicles are used. Where sales are made without vehicles, $2 per day, per applicant.

*well v. Connecticut*, 310 U. S. 296. They hold, in effect, that ordinances forbidding the distribution or sale on the streets of a municipality of pamphlets, magazines, or periodicals, not in themselves harmful, unless a license permitting it has first been obtained from the proper municipal authority, are void as in conflict with the constitutional provisions against laws abridging the freedom of the press.[2] The case of *Lovell v. Griffin* is practically on all fours in so far as the ordinance under consideration relates to pamphlets, magazines and periodicals; and our judgment in this case does not affect the ordinance in other respects. The ordinance in the *Lovell v. Griffin* case prohibited as a nuisance the distribution, by hand or otherwise, of circulars, handbooks, advertising, or literature of any kind, whether delivered free or sold, without first obtaining permission from the city manager. Chief Justice HUGHES, speaking for the Court said: "The ordinance in its broad sweep prohibits the distribution of 'circulars, handbooks, advertising, or literature of any kind.' It manifestly applies to pamphlets, magazines and periodicals. The evidence against appellant was that she distributed a certain pamphlet and a magazine called the 'Golden Age.' Whether in actual administration the ordinance is applied, as apparently it could be, to newspapers does not appear ...... The ordinance is not limited to 'literature' that is obscene or offensive to public morals or that advocates unlawful conduct. There is no suggestion that the pamphlet and magazine distributed in the instant case were of that character. The ordinance embraces 'literature' in the widest sense.

"The ordinance is comprehensive with respect to the method of distribution. It covers every sort of circulation 'either by hand or otherwise.' There is thus no restriction in its application with respect to time

---

[2]—Article I of the Amendments to the Federal Constitution, as extended by Article XIV.

or place. It is not limited to ways which might be regarded as inconsistent with the maintenance of public order or as involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets. The ordinance prohibits the distribution of literature of any kind at any time, at any place, and in any manner without a permit from the city manager.

"We think that the ordinance is invalid on its face. Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish *without* a license what formerly could be published only *with* one[1].' While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision. See *Patterson v. Colorado,* 205 U. S. 454, 462; *Near v. Minnesota,* 283 U. S. 697, 713-716; *Grosjean v. American Press Co.* 297 U. S. 233, 245, 246. Legislation of the type of the ordinance in question would restore the system of license and censorship in its baldest form.

"The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. What we have had recent occasion to

---

"[1]—See Wickwar, 'The Struggle for the Freedom of the Press,' p. 15."

say with respect to the vital importance of protecting this essential liberty from every sort of infringement need not be repeated. *Near v. Minnesota,* supra; *Grosjean v. American Press Co.,* supra; *DeJonge v. Oregon,* supra [299 U. S. 353, 364].

"The ordinance cannot be saved because it relates to distribution and not to publication. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' *Ex parte Jackson,* 96 U. S. 727, 733. The license tax in *Grosjean v. American Press Co.,* supra, was held invalid because of its direct tendency to restrict circulation.

"As the ordinance is void on its face, it was not necessary for appellant to seek a permit under it. She was entitled to contest its validity in answer to the charge against her. *Smith v. Cahoon,* 283 U. S. 553, 562."

The historical reference to 'pamphlets' in that opinion and in other opinions of that court (*Schneider v. State (Town of Irvington),* supra, p. 164; *Thornhill v. Alabama,* 310 U. S. 88, 97; *Grosjean v. American Press Co.,* 297 U. S. 233, 245-250, etc.) is not limited to 'pamphlets' which are distributed without cost. Every student of history knows that the 'pamphlets' referred to by Chief Justice HUGHES in his opinion, and by Mr. Justice SUTHERLAND in the Grosjean case, were not for the most part circulated *gratis,* but were distributed to subscribers or sold. They "were the immediate predecessors of weekly newspapers ...... Under Queen Anne pamphlets arrived at a remarkable degree of importance. Never before or since has this method of publication been used by such masters of thought and language. Political writing of any degree of authority was almost entirely confined to pamphlets. If the Whigs were able to command the services of Addison and Steele, the Tories fought with the terrible pen of Swift." Encyclopaedia Britannica, Vol. 20, Pamphlets, pp. 659-660. "The pamphlet is popular as an instrument of religious or

political controversy in times of stress. It is relatively inexpensive to the purchaser and to the author or the publisher, it can be more timely than a book bound in cloth or leather, and it gives author and readers the maximum benefit of freedom of the press." The Columbia Encyclopedia, 'Pamphlet'.

The case chiefly relied upon by the court below, *Pittsburgh v. Ruffner*, 134 Pa. Superior Ct. 192, 4 A. 2d 224, was entirely different on its facts. Because of those differences we distinguished it from *Lovell v. Griffin*, supra, see p. 200. The ordinance in the Ruffner case did not relate to the sale of magazines and periodicals on the public streets. It was limited to selling, or soliciting orders for, merchandise *from house to house, or in buildings.* It imposed no license fee, and was purely a police measure designed to protect householders and occupants of buildings from being molested and victimized by irresponsible and unscrupulous agents and salesmen. We said (pp. 199-201) : "Nor does the ordinance unlawfully infringe upon the constitutional right of freedom of the press. This appellant may, notwithstanding this ordinance, freely print and communicate his thoughts and opinions and may freely speak, write and print on any subject, 'being responsible for the abuse of that liberty', and he may, subject to reasonable regulation, freely distribute the same; but that furnishes no warrant for upholding his *unlimited and unrestricted* right to enter the homes and offices of others to *sell* to them the books and pamphlets he may have written or books and pamphlets expressive of his thoughts and opinions. The case of *Lovell v. Griffin*, 303 U. S. 444, on which appellant relies, declares no such doctrine ...... The present ordinance relates only to the hawking and peddling of merchandise and the *selling* of goods and merchandise from house to house, or in buildings within the City limits. Its purpose is reasonable and salutary—the protection of the public against

fraud and imposition. That books and pamphlets may be merchandise cannot be doubted; and that venders of books and printed material may be unworthy and unscrupulous and may deceive and defraud the public is too well known to need extensive reference. We have had in this court a number of cases where advantage was taken of householders and business men by unscrupulous book agents. The latest case which comes to our recollection is *Ashland Towson Corp. v. Kasunic,* 110 Pa. Superior Ct. 496, 168 A. 502. And the case of *Federal Trade Commission v. Standard Education Society,* 302 U. S. 112, decided in 1937, is proof positive that the selling of books by agents is not wholly free from deceitful practices.''

We may add that, in our opinion, canvassing for *subscriptions* for books, magazines and periodicals, to be delivered in the future, which is a common source of fraud and victimization, does not come within the constitutional provisions guaranteeing the freedom of the press, without restriction.

We are of opinion that nothing in our other cases, cited by the court below, (*Com. v. Stewart,* 137 Pa. Superior Ct. 445, 9 A. 2d 179, appeal refused by the Supreme Court of Pennsylvania, 127 Pa. Superior Ct. xxxiii, certiorari denied by the Supreme Court of the United States, 309 U. S. 674, 699; *Com. v. Palms,* 141 Pa. Superior Ct. 430, 15 A. 2d 481; *Com. v. Hessler,* 141 Pa. Superior Ct. 421, 15 A. 2d 486), supports the action of the court below; and also that there is nothing in any of them in conflict with the recent decisions of the Supreme Court of the United States. We call attention to the fact that our case of *Com. v. Schurman,* 125 Pa. Superior Ct. 62, 189 A. 503, is in harmony with the subsequent decision of that court in *Cantwell v. Connecticut,* 310 U. S. 296; and that *Com. v. Hessler,* supra, is in full accord with the later pronouncement of the Supreme Court of the United States in *Cox v. New*

*Hampshire,* 312 U. S. 569, 61 Sup. Ct. Rep. 762, (HUGHES, C. J.), decided March 31, 1941.

To the extent above indicated the ordinance in question is unconstitutional and void.

The judgments are reversed and the appellants discharged.