Commonwealth *v.* Stehley, Appellant.

Submitted March 10, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Thomas C. Zerbe, Jr.*, Assistant Public Defender, and *Richard D. Walker*, Public Defender, for appellant.

*Marion E. MacIntyre* and *Edwin W. Frese, Jr.*, Deputy District Attorneys, and *LeRoy S. Zimmerman*, District Attorney, for Commonwealth, appellee.

OPINION BY CERCONE, J., April 22, 1975:

In the instant case, appellant challenges three of his four convictions on four separate indictments for malicious use of telephones under our former Penal Code, 18 P.S. §4414.1 (App. 1973). The obscene phone calls for which appellant was convicted were made on numerous occasions to four different women between June, 1972, and April, 1973. In the case of three of the indictments, a substantial part of the evidence establishing Harry Stehley as the obscene phone caller was produced by the use of a "pen register" by the Commonwealth Telephone Company at the request of the State Police. Appellant's sole contention herein is that the use of the pen register was illegal under the Penal Code, 18 P.S. §3742 (App. 1973), so that the evidence produced thereby should have been suppressed.

Section 3742 of the Penal Code provided in pertinent part:

"No person shall intercept a communication by telephone or telegraph without permission of the

> parties to such communication. No person shall install or employ any device for overhearing or recording communications passing through a telephone or telegraph line with intent to intercept a communication in violation of this act. No person shall divulge or use the contents or purport of a communication intercepted in violation of this act . . . [e]xcept as proof in a suit or prosecution for a violation of this act, no evidence obtained as a result of an unlawful interception shall be admissible in any [judicial] proceeding. . . ."

Thus, appellant's allegation is that the use of the pen register constituted an interception of a telephone communication to which he was a party, without his consent. In order to evaluate the validity of this argument, some basic understanding of the operation of a pen register is necessary.[1]

The advent of the dial telephone created a need for a device which could replace the human hand of the operator and automatically provide the telephone company with information necessary to the operation and billing of a large and complex telephone system; and, the pen register was developed to fill that need. A pen register is connected to a particular line which is to be observed, so that when the receiver is lifted from the base of the telephone and a number is dialed, the pen register is activated by the change in the electrical pulses caused by the dialing. Each pulse is recorded on paper as a dash; and, since the number of pulses corresponds to the number which is dialed, the pen register records a "printout" of the telephone numbers which have been called, and the times at which the calls were made, from the telephone under observation. Since the pen register shuts off when the last digit is dialed, it does not aurally record

---

1.  See, generally, Claerhout, The Pen Register, 20 Drake L. Rev. 108 (1970).

communications, nor does it even indicate whether the phone which was called has rung or been answered. Thus, the content of any message sent, or even the fact that any *message* was sent or received, is not provable from the information produced solely by a pen register.

In order for a pen register to be effective in ferreting out obscene phone callers,[2] the recipient of the phone calls must be able to identify a suspect, as by recognizing his voice, so that the telephone company may monitor his phone with the pen register. Then, the recipient must record the time at which an obscene phone call was received for comparison with the time which the pen register recorded that the user of the observed phone dialed the recipient's number. This procedure is necessary, of course, because the pen register does not record the conversation, itself. Hence, the only evidence that the phone call was in fact obscene or harassing will be provided by the testimony of the recipient of the call.

Keeping in mind the mechanics of the pen register, and the type of information it provides, we now turn to the question of whether the use of the device falls within the ambit of the former Pennsylvania anti-wiretap act quoted above, which was applicable at the times at which the crimes were committed. In particular, we must determine whether such a device "intercept[s] a communication" or is a "device for overhearing or recording communications passing through telephone . . . lines."

Insofar as the courts of this Commonwealth are concerned, the question is one of first impression. Other jurisdictions have had the opportunity to treat the problem, however, and the developing case law is instructive. In *United States v. Focarile,* 340 F. Supp. 1033 (D. Md. 1972), the district court examined the use of a pen regis-

---

2. There are apparently something like 750,000 annoyance call complaints every year. See *State v. Halliday,* 169 N.W.2d 768, 778 (Iowa 1969).

ter in the context of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §2510, and concluded that the evidence produced by use of a pen register was not prohibited thereunder. The court reached that conclusion for two reasons: (1) The operation and product of pen register "monitoring" is "non-aural;"[3] and, (2) The prohibition of pen register use was not intended by the Congress in drafting Title III of the act. In support of this latter conclusion, the court referred to congressional records which state:

> "The proposed legislation is not designed to prevent the tracing of phone calls. The use of a 'pen register,' for example, would be permissible. . . . The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication." 1968 U.S. Code Cong. & Admin. News at p. 2178.

The court's conclusion in *Focarile* received support when that case rose to the Supreme Court sub nomine *United States v. Giordano*, 416 U.S. 505, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974). Although the majority in that 5-4 decision did not reach the question of whether pen registers fell under the specific prohibition of Title III, Mr. Justice POWELL (joined by the Chief Justice, Mr. Justice BLACKMUN and Mr. Justice REHNQUIST) did discuss that aspect of the decision of the court below.[4] In speaking for the minority, Mr. Justice POWELL stated:

> "The installation of a pen register device to monitor and record the numbers dialed from a particular telephone line is not governed by Title III. . . . This

---

3. Section 2510(4) defines "intercept" to be "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device."

4. The majority found that the evidence produced by the pen register device was tainted by evidence produced under a statutorily unsatisfactory wiretap authorization, and thus barred by the derivative evidence rule. 416 U.S. at 529-33.

conclusion rests on the fact that the device does not hear sound and therefore does not accomplish any 'interception' of wire communications as that term is defined by 18 U.S.C. § 2510(4). . . ."

"Because a pen register device is not subject to the provisions of Title III, the permissibility of its use by law enforcement authorities depends entirely on compliance with the constitutional requirements of the Fourth Amendment."[5] 94 S. Ct. at 1844-1845, 40 L.Ed.2d at 374-75.

The same result was reached in *People v. Stewart,* 342 N.Y.S.2d 127 (C.C.N.Y. 1974); and, *In re Korman,* 351 F. Supp. 325 (N.D.Ill. 1972).

In *Bixler v. Hille,* 497 P.2d 594 (Wash. 1972), the Supreme Court of Washington determined that their anti-wiretapping statute, which required the consent of both parties to a communication in order to wiretap, did not bar the use of pen registers. As the court therein stated at page 596: "The pen register does not record conversations. It cannot divulge conversations. While other devices exist for such purposes, the pen register does nothing except [record the impulses from dialing]." See also *People v. Schneider,* 257 N.Y.S.2d 877 (Sup. Ct. 1965).

Returning to the provisions of our own anti-wiretap statute, we are persuaded by the cases referred to above, that the use of a pen register is not a device prohibited by the act. Ordinarily, as in the instant case, the mere dialing of a telephone is no more a "communication" than is clearing one's throat. Nor is a pen register a device for "overhearing or recording communications." Although we have not been referred to, nor has our

---

5. Although the police did not obtain a search warrant in the instant case, the question of whether they are required to do so was not raised before the court below or in the instant appeal. Hence we will not consider it herein. See, e.g., *Commonwealth v. Reid,* 458 Pa. 357, 326 A.2d 267 (1974); *Commonwealth v. Agie,* 449 Pa. 187 (1973).

research revealed, any explicit expression of our legislature's intent with regard to pen registers, our anti-wiretap statute is clearly designed to protect the "contents or purport" of a communication, and not the fact that a communication has been attempted. Coupled with the fact that the telephone company routinely monitors the destination of all toll calls for billing purposes, we find no significant expectation of privacy to exist with respect to the destination of one's phone calls. Certainly the expectation of privacy in this regard is not so great that it cannot be adequately protected from intrusion by the Fourth Amendment.

Judgment of sentence affirmed.