475 A.2d 783

COMMONWEALTH of Pennsylvania

v.

Ida BEAUFORD, Appellant.

COMMONWEALTH of Pennsylvania

v.

Karin GUINN, Appellant.

COMMONWEALTH of Pennsylvania

v.

Ulysses MATTHEWS, Appellant.

COMMONWEALTH of Pennsylvania

v.

Michael Patrick HAYES, Appellant.

COMMONWEALTH of Pennsylvania

v.

Cynthia O. FORCINO, Appellant.

COMMONWEALTH of Pennsylvania

v.

Raymond Joseph MURTHA, Appellant.

Superior Court of Pennsylvania.

Argued Feb. 17, 1983.

Filed April 13, 1984.

Reargument Denied June 18, 1984.

Petition for Allowance of Appeal Granted Nov. 29, 1984.

254

Timothy J. Gorbey, Media, for appellants (at Nos. 3351, 247 & 1136).

John Rogers Carroll, Media, for appellants (at Nos. 1763, 1798 & 2666).

Sheldon Kovach, Assistant District Attorney, Media, for Com., appellee.

Before CIRILLO, JOHNSON and MONTEMURO, JJ.

CIRILLO, Judge:

These consolidated, direct appeals raise an issue of first impression in this Commonwealth: whether the utilization by law enforcement agencies of pen registers or dialed number recorders (DNRs) requires a judicial order based upon probable cause. We hold that such an order is required, and reverse the judgments of sentence.

Each of the six appellants was arrested in March of 1981 after searches of their individual residences revealed vari-

ous illegal gambling paraphernalia and, as to certain appellants, controlled substances. After separate non-jury trials, each appellant was convicted of lotteries [1] and gambling.[2]

Following their convictions, each appellant argued motions for a new trial, all of which were subsequently denied and sentences imposed. Notices of appeal were filed and appeals consolidated to this Court.

Viewing the evidence in the light most favorable to the verdict winner, *Commonwealth v. Parker*, 494 Pa. 196, 431 A.2d 216 (1981), the record discloses that an investigation into alleged illegal gambling activities in Delaware County during January of 1981 revealed that Cynthia O. Forcino was operating an illegal numbers operation from her residence in Drexel Hill. On February 10, 1981, the police submitted an application to the trial court for an order permitting the installation of a DNR on Forcino's telephone line to monitor the numbers dialed from that unit. The trial court granted the application on the same day.

On February 11, 1981 a confidential informant contacted the police with information concerning Forcino's numbers operation. The informant told of personally witnessing Forcino taking bets by telephone in her residence. The informant gave a description of Forcino, her address, telephone number, and the vehicles she drove and also stated that Forcino had eight to ten numbers writers with whom she kept in contact by telephone. Through subsequent checks the police substantially corroborated the informant's tips.

Thereafter, an order was secured from the trial court for DNR monitoring of the telephone number registered to appellant Karin Guinn, as police had subsequently received

1. 18 Pa.C.S. § 5512.

2. *Id.* § 5513.
Appellant Murtha was also convicted of poolselling and bookmaking, § 5514, appellant Forcino of possession of a controlled substance, 35 Pa.S. § 780–113(a)(16), and appellant Hayes of both possession and possession with intent to deliver a controlled substance, 35 Pa.S. § 780–113(a)(16), (a)(30).

information from the same informant stating that Forcino would be forwarding her incoming calls to that number.

On February 27 and March 2, 1981 the confidential informant spoke with police and informed them that Forcino had told him that she was moving her gambling operation telephone number. On each occasion the informant gave police the new number. Checks of the new telephone numbers by police revealed the names and addresses of the parties to whom these numbers were registered. Subsequent police surveillance also confirmed the presence of one of Forcino's vehicles parked outside those addresses. The authorities then secured orders for the installation of DNRs for those telephone numbers received from the informant.

As a result of monitoring the various DNRs, the evidence revealed substantial numbers of outgoing and incoming calls of short duration (one minute or less) between the hours of noon and 7:00 p.m., Monday through Saturday[3] among the various telephone lines used by Forcino and Guinn. The remaining four appellants were implicated by evidence of frequent calls made during the monitored time period from the Forcino and Guinn monitored telephones, to numbers registered to appellants.[4]

Separate search warrants for each appellant were secured and executed on March 6, 1981, resulting in each appellant's arrest and the confiscation of gambling materials and, in the case of Forcino and Hayes, controlled sub-

---

**3.** The informant had told the authorities that the numbers operation was based on the illegal day number and the Pennsylvania Daily Number, both of which are determined at 7:00 p.m. Monday through Saturday.

**4.** The search warrant applications recite the following numbers of telephone calls during the hours of 12:00 noon to 7:00 p.m. Monday through Saturday, among the various appellants:
Beauford: from 2/20/81—3/4/81—50 calls from Guinn #
Matthews: from 2/20/81—3/4/81—33 calls from Guinn #
Hayes: from 2/17/81—3/4/81—9 calls from Forcino # from 2/20/81—3/4/81—54 calls from Guinn #
Murtha: from 2/17/81—3/4/81—11 calls from Forcino #
The evidence also indicates that during the periods monitored Forcino's number received a total of 330 calls and Guinn's number 580 calls.

stances. Each appellant subsequently filed motions to suppress, which were denied.

Appellants raise various challenges to the searches and seizures conducted in this case, but the issue which most concerns us is the legality of the DNR monitoring which later led to the searches of appellants' residences. Appellants contend the monitoring was both constitutionally and statutorily unlawful.

Before explaining why we accept appellants' constitutional argument, we review the statutory argument to lay the groundwork for our holding.

## I

■ Appellants argue that under the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. §§ 5701–5726, the police were required to obtain authorization from a Superior Court judge before installing DNRs. The argument turns on a distinction drawn between "pen registers" and DNRs.

The Act, in general, makes criminal the willful interception of any wire or oral communication. *Id.* § 5703(1).

"Intercept" is defined by the Act as the "[a]ural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." *Id.* § 5702.

The Act defines "contents" as:

*"Contents."* As used with respect to any wire or oral communication, is any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication.

The Act provides conditions under which law enforcement authorities may obtain legal authorization to intercept wire or oral communications. In brief, the Act provides that such authorization may issue only from a Superior Court judge upon application from the Attorney General or a district attorney or their designees. The requirements for

such an application and order are detailed at *id.*, §§ 5708–5710, 5712.

Section 5704 of the Act enumerates certain activities which it holds not to be unlawful. Specifically, section 5704(5) states that it shall not be unlawful for "[a]ny investigative or law enforcement officer ... to use a pen register." "Pen register" is defined in section 5702 as:

A mechanical or electronic device which attaches to a particular telephone line, and which records outgoing numbers dialed by a particular telephone, but does not:

(1) monitor the contents of any communication; or

(2) record the origin of any incoming communications.

Case law has held that a pen register bears the following characteristics: 1) it is a mechanical or electronic device, 2) usually installed at a central telephone company facility on an individual telephone line, 3) which records numbers dialed by the subject telephone on a paper tape by monitoring the electrical impulses caused by dialing, and 4) records on the tape the time the numbers are dialed. *See United States v. New York Telephone Company*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); *Commonwealth v. Stehley*, 235 Pa.Super. 150, 338 A.2d 686 (1975).

The Hekimian Model 110 Dialed Number Recorders utilized in the instant case have, in addition to the functions described in the traditional definition of pen registers above, the capability of monitoring: 1) the length of time the targeted telephone is off the hook on outgoing calls and 2) the date and length of time the targeted telephone is off the hook on incoming calls.

Appellants argue that these additional characteristics, specifically the capability of the DNRs to determine that an incoming call was completed, amount to an ability to "monitor the contents" of a communication, so that a DNR is removed from the statutory definition of a pen register. Consequently, they argue, a DNR falls under the authorization requirements of the Act.

We disagree, and find that the technical differences between a pen register and the DNRs used in this case are immaterial under the Act, as neither technically permits "[a]ural acquisition of the contents" of any communication. *See United States v. New York Telephone Co., supra.*

## II

Appellants' constitutional claim is that, notwithstanding the Act, neither a pen register nor a DNR may be installed by law enforcement authorities without a judicial order based on probable cause. Since the court orders authorizing installation of the DNRs in this case indisputably were not based on records establishing probable cause,[5] appellants argue that the evidence gathered through use of the DNRs was unconstitutionally obtained.[6]

**5.** According to the Commonwealth, it obtained the orders "[i]n an abundance of caution and in order to more readily obtain the cooperation of the telephone company...." Brief for Appellee at 8. The form applications for the orders state in conclusory fashion that the numbers to be monitored were being used to place and accept illegal bets, and that DNR monitoring of the numbers would aid in investigating the illegal activity. The applications contain no evidence upon which a determination of probable cause could be made.

**6.** The Commonwealth argues that this claim was not stated specifically enough in appellants' suppression motions, and was continually "developed and refined" throughout pretrial proceedings. The Commonwealth would have us conclude that the claim was waived because the "grounds" for the claim were not stated with sufficient particularity pursuant to Pa.R.Crim.P. 323(d).

We reject this contention. The identical suppression motions filed on behalf of appellants Hayes, Forcino, and Murtha state that "the information used to obtain the DNR orders is insufficient and the orders themselves were legally and constitutionally unjustified," and in the next paragraph cite to article 1, § 8 of the Pennsylvania Constitution and to the fourth and fourteenth amendments to the federal constitution.

The supplemental omnibus pretrial motions filed on behalf of appellants Beauford, Guinn, and Matthews, although not citing to specific constitutional provisions, allege that "there was no probable cause or insufficient probable cause for the issuance" of the DNR orders, and that the defendants' constitutional rights had therefore been violated. The motions for these defendants also reserved the right to advance more specific grounds for the suppression of evidence upon the hearing of the motions.

The constitutional issue posed was expressly reserved in *Commonwealth v. Stehley, supra,* and has not heretofore been decided for this Commonwealth.

The right upon which appellants rely is recognized in both the fourth amendment to the federal constitution and article 1, § 8 of the Pennsylvania Constitution, which states:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Embodied in the constitutional statements of the principle, however, is a right to privacy older than either the federal or state constitution. *Commonwealth v. Palms,* 141 Pa.Super. 430, 15 A.2d 481 (1940). The right to be free from unreasonable searches and seizures is at the foundation of our body politic, in direct line with "the proud boast of an Englishman that his home was his castle and that as long as he obeyed the law, the King and his army could not enter it against his will." *Id.,* 141 Pa.Superior Ct. at 439, 15 A.2d at 485.

█ We are a long way from castles; today government has at its disposal electronic eyes and ears capable of detecting the actions of people on the far side of the globe, not to mention around the corner and in the home. But we still cherish our privacy, and today the constitutional prohibition against unreasonable searches and seizures extends beyond the home to protect the individual against unwarranted government intrusions into any area where the individual may harbor a reasonable expectation of privacy.

The cases of all six appellants were consolidated for hearing, by which time the Commonwealth certainly had been made aware that each appellant was challenging the constitutionality of the DNR orders. It is hard to imagine how the motions could have led the Commonwealth to think otherwise than that lack of probable cause was the "ground" for the challenge. Especially given the undeveloped state of Pennsylvania law concerning DNR use, we believe the motions were sufficiently particular.

*Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Commonwealth v. Morrison,* 275 Pa. Super. 454, 418 A.2d 1378 (1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *Commonwealth v. Gabrielle,* 269 Pa.Super. 338, 409 A.2d 1173 (1979); *Commonwealth v. Adams,* 234 Pa.Super. 475, 341 A.2d 206 (1975).

The Commonwealth's position is that it has already been conclusively decided that the information obtainable through use of a pen register—that is, information concerning the numbers dialed from a particular telephone—is outside the constitutionally protected sphere of privacy. In *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), a 5–3 majority of the United States Supreme Court held that use of a pen register is not a "search" under the fourth amendment to the United States Constitution, thus affirming the decision of a divided Maryland Court of Appeals that the fourth and fourteenth amendments did not preclude Maryland authorities from installing pen registers without probable cause. *Smith v. State,* 283 Md. 156, 389 A.2d 858 (1978).

The *Smith* majority found that a telephone caller could entertain no legitimate expectation of privacy in the numbers he dialed because the telephone company and its employees as a matter of course had access to this information. Finding that a caller voluntarily conveyed this information to the telephone company, the Court determined that the Constitution imposed no restriction on third-party access to the information.

The court relied on its own decision in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), which held that police could gain access to a depositor's bank records on less than probable cause. The Court in *Miller* had expressed its belief that a bank depositor had no legitimate expectation of privacy in financial information that he voluntarily conveyed to the bank and its employees in the ordinary course of business. By logically extending this rationale to telephone records, the *Smith* Court was

able to conclude that a caller could not reasonably expect them to remain private either. The next step for the Court was to note that a pen register revealed no more information than telephone records contained. Hence, in conclusion, using a pen register to record the numbers dialed from a personal telephone was not a fourth amendment "search," and could be engaged in by law enforcement officials without probable cause.

The fallacy in the Commonwealth's reliance on *Smith* is the implicit assumption that our *state* constitution provides no greater protection against the installation and use of pen registers than the *federal* constitution provides. Although *Smith* conclusively decides the extent of the fourth amendment guarantee in this area, appellants have also asserted their rights under article 1, § 8 of the Pennsylvania Constitution. We turn now to the state constitutional claim.

■ Preliminarily, it cannot be doubted that this state has the constitutional power to guard individual rights, including the right to be free from unreasonable searches and seizures, more zealously than the federal government does under the United States Constitution. *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983); *Kroger Co. v. O'Hara Township*, 481 Pa. 101, 392 A.2d 266 (1978); *Commonwealth v. Harris*, 429 Pa. 215, 239 A.2d 290 (1968); *Commonwealth v. Walsh*, 314 Pa.Super. 65, 460 A.2d 767 (1983). "The present function of state constitutions is as a second line of defense for those rights protected by the federal constitution *and as an independent source of supplemental rights unrecognized by federal law.*" Note, *The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324, 1367 (1982) (emphasis added). Commentators urge state governments to reflect deeply before deciding whether state constitutional provisions affecting individual liberties conform to similar provisions in the federal constitution. W. Brennan, *State Constitutions and the Protection*

*of Individual Rights,* 90 Harv.L.Rev. 489, 501 (1977); Note, *The New Federalism: Toward a Principled Interpretation of the State Constitution,* 29 Stan.L.Rev. 297 (1977).

In our effort to delineate the protection afforded to privacy interests under our state constitution, we have a particularly instructive precedent in *Commonwealth v. De-John,* 486 Pa. 32, 403 A.2d 1283 (1979) (Opinion by O'Brien, J., joined by Eagen, C.J., and Nix, J.; Manderino, J., concurred in the holding but dissented on other grounds; Roberts, J., concurred specially), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980). There our own Supreme Court expressly rejected the reasoning in *Miller* and held that police can gain access to banking records only through a warrant based on probable cause. Our state high court thus extended more privacy protection to banking records under article 1, § 8, than the United States Supreme Court provides under the federal constitution.

We must question whether, under our state constitution, there is a valid distinction between privacy interests in telephone records and privacy interests in banking records—a distinction the *Smith* Court rejected in fourth amendment analysis. In deciding whether to part ways with the constitutional interpretation espoused in *Smith,* we can draw on the wise counsel taken by the *DeJohn* Court when it decided that *Miller* should not be followed:

> "For a state court interpreting a state constitution, opinions of the United States Supreme Court are like opinions of sister state courts or lower federal courts. While neither binding in a constitutional sense nor precedential in a jurisprudential one, they are entitled to whatever weight their reasoning and intellectual persuasiveness warrant. One would expect a state court to deal carefully with a Supreme Court opinion and to explain forthrightly why it found itself constrained to reason differently. But such a difference in reasoning should be no more alarming that the differences which impel one judge to dissent from another's opinion, one court to disagree with another, or the judges of any court to disagree with a

precedent established by their predecessors." Falk, The State Constitution: A More Than "Adequate" Nonfederal Ground, 61 Calif.L.Rev. 273, 283–84 (1973).

486 Pa. at 44, 403 A.2d at 1289.

Having considered this counsel, and the jealousness with which the right to privacy in telephonic communications traditionally has been guarded in Pennsylvania, we strongly believe we should reject the *Smith* reasoning and extend the *DeJohn* holding to information obtainable through use of a pen register.

We begin with our reasons for rejecting *Smith*.

According to the *Smith* majority a caller who dials a telephone in our society should expect that the police will have complete access to the numbers dialed because he provides them to the telephone company. The logic of this position escapes us. For all practical purposes an individual in America today has very little choice about whether the telephone company will have access to the numbers he dials and the frequency of times he dials them. The company has a virtual monopoly over vital communications media, and the individual must accept that this information will be collected by the company for billing purposes. It is quite another thing to suggest that the telephone caller should therefore expect that the company will turn this information over to a third party without legal process for a purpose unrelated to providing telephone service.

On the contrary, we are convinced that a person picking up a telephone in his home or office fully expects that the number he is about to dial will remain as private as the contents of the communication he is about to have. That number provides a strong, sometimes conclusive inference as to whom is being called, unquestionably a private matter. The caller certainly evidences no intention to shed his veil of privacy merely because he chooses to use the telephone to make private contacts. In modern-day America the telephone call is a nearly indispensable tool used to conduct the widest range of business, government, political, social, and personal affairs. Certainly the vast majority of calls are

unrelated to criminal enterprise, and yet the vast majority of callers would not think of allowing the destination of their every call to be recorded by the police. Attaching a pen register to a phone line may reveal secrets as innocent as daily calls to mother. On the other hand, such surveillance might also reveal frequent calls to an illicit lover, or suspected organized crime figures, or suspected gamblers and bookmakers. Obviously, access to information about who is talking to whom, even without direct access to the contents of what they are saying, can be a powerful tool for either good or bad ends. In any case we do not hesitate to say that a caller and the person he calls expect and are entitled to as much privacy in the fact they are talking to one another as in what they say to each other.

The fact that the telephone company and its employees in the course of providing telephone service collect information on the numbers dialed from a particular phone does not alter one whit the ordinary expectation that the prying eyes of government or anyone else will be kept in the dark absent legal process. Indeed, an expectation to the contrary—that information provided to the telephone company for a limited record-keeping purpose automatically becomes available to the police for criminal investigatory purposes— should have no foundation in a free society. The legislature of this Commonwealth has explicitly recognized that information accessed by the telephone company does not thereby enter the public domain, or the field of scrutiny open to the police. In its anti-wiretap statutes the General Assembly has repeatedly exempted communications common carriers, acting in the scope of their business, from the statutory ban against intercepting telephone calls, while maintaining strict controls over resorts to wiretapping by law enforcement authorities. *Compare* 18 Pa.C.S. § 5703 *with* § 5704(1) *and* §§ 5708–5710. *Cf.* Act of April 7, 1976, P.L. 69, No. 30, sec. 1, § 5702; Act of Dec. 27, 1974, P.L. 1007, No. 327, sec. 4, § 5705(c)(1); Act of June 27, 1973, P.L. 69, No. 29, sec. 1, § 5702(b).

We thus appraise *Smith* as manifestly unpersuasive.

Moreover, our constitutional interpretation derives independent support from Pennsylvania's long history of affording special protection to the privacy interest inherent in a telephone call. For most of this century the legislature absolutely prohibited wiretapping by law enforcement authorities, and imposed both civil and criminal liability for violations. *See* Act of Dec. 6, 1972, P.L. 1482, No. 334, §§ 5701–5704. Justice Roberts commented on this absolute ban:

Hence, the Legislature has determined as a matter of state public policy that the rights of any caller to the privacy of his conversation is of greater societal value than the interest served by permitting eavesdropping and wiretapping.

*Commonwealth v. Papszycki*, 442 Pa. 234, 239, 275 A.2d 28, 30 (1971).

This state's prohibition on investigative wiretapping of any sort continued in force until the provisions of the 1972 act were replaced by the Wiretapping and Electronic Surveillance Control Act of Oct. 4, 1978, P.L. 831, No. 164, 18 Pa.C.S. §§ 5701–5726. The new act for the first time allows wiretapping for police investigative purposes, but only after a strict showing of need by the attorney general or a district attorney before a Superior Court judge. 18 Pa.C.S. §§ 5708–5710. The remarks of Mr. Rhodes, who reported the proposed act out of the House Judiciary Committee, reflect the caution with which the General Assembly approached this sensitive area:

Briefly, Mr. Speaker, supporting the position of Representative Scirica, I hope the membership will understand that the guiding philosophy behind our version of SB 191 and this set of amendments is that we wanted to limit the amount of wiretapping that would follow the enactment of this statute, because we have had this long prohibition in Pennsylvania and we really do not know what is going to happen after we enact this statute. We want to limit it *as much as possible* to protect individual rights and give law enforcement the necessary tools.

> If it turns out that various features of the amendment or the statute overly prohibit or limit the action of law enforcement, we could always expand it. But I think, Mr. Speaker, the people of the state want to start *modestly* in this area of eavesdropping and wiretapping with all the transgressions that we know about in the last decade, and they would greatly support our adoption of the amendment before us now.

House Legislative Journal at 3147 (1978) (emphasis supplied). The legislature further evidenced its intention to "start modestly in this area of eavesdropping and wiretapping" by attaching an automatic five-year repealer to the act. Act of Oct. 4, 1978, P.L. 831, No. 164, § 3 (extended for another five years by Act of Dec. 2, 1983, P.L. 501, No. 67, sec. 2, § 5727).

Although it is true the use of pen registers by law enforcement authorities is exempted from the strict requirements of the Act, 18 Pa.C.S. §§ 5704(5), we do not consider this to be an expression of opinion by the legislature that use of pen registers is free from constitutional restraints as well. The far-reaching consequences of such a position would fly directly in the face of the legislative intent to forge a modest start in electronic surveillance. If any law enforcement officer could, with or without probable cause or even reasonable suspicion, use a pen register on his own authority to record every number dialed by any citizen in Pennsylvania from a residential, business, or government phone, the pen register clearly could become a powerful weapon threatening invasion not only of the individual's intimate privacy, but also his political liberty, including his rights to associate, to express his views, and even to think in freedom. *See* D. King, *Wire Tapping and Electronic Surveillance: A Neglected Constitutional Consideration*, 66 Dick.L.Rev. 17 (1961); *Reporters Committee for Freedom of the Press v. American Telephone & Telegraph Co.*, 593 F.2d 1030 (D.C.Cir.1978) (Dissenting Opinion by Wright, C.J., Part II.C.I), *cert. denied*, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979); *compare* G. Orwell, *1984* (1949).

■ The importance of the citizen's right to privacy in telephonic communications, and the potential for abuse in a system where indiscriminate use of pen registers is allowed, have led us to the conclusion that an individual's expectation of privacy in the telephone numbers he calls is reasonable, legitimate, and therefore constitutionally protected against government surveillance and intrusion without probable cause. Pa. Const. art. 1, § 8; *Commonwealth v. DeJohn, supra; Commonwealth v. Platou*, 455 Pa. 258, 312 A.2d 29 (1973), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *cf. Commonwealth v. Papszycki, supra; Commonwealth v. Baldwin*, 282 Pa.Super. 82, 422 A.2d 838 (1980).

We hold that the installation and use of pen registers and DNRs by law enforcement authorities is limited to those situations in which an order issues upon probable cause.[7] Our holding is in accord with well-reasoned decisions in our sister states where the state constitutional right to be free from unreasonable searches and seizures precludes the government from without probable cause using pen registers to record telephone numbers dialed in privacy. *People v. Blair*, 25 Cal.3d 640, 602 P.2d 738, 159 Cal.Rptr. 818 (1979); *People v. Sporleder*, 666 P.2d 135 (Colo.1983);[8]

---

7. We do not intend by our holding to require that applications to install pen registers in all cases follow the form prescribed for search warrant applications in Pa.R.Crim.P. 2006. Certain features of the model application and warrant set out in Rule 2006 are not easily adaptable to applications to install pen registers. However, pen register applications must comply with Pa.R.Crim.P. 2003(a) and (b), which require that evidence establishing probable cause for issuance of a warrant appear in writing within the four corners of the affidavits submitted to the issuing authority. *Commonwealth v. Turner*, 284 Pa.Super. 395, 425 A.2d 1161 (1981); *and see Commonwealth v. Swint*, 256 Pa.Super. 169, 389 A.2d 654 (1978). This requirement directly effectuates the constitutional mandate that warrants issue only on probable cause, "supported by oath or affirmation subscribed to by the affiant."

8. *Blair* and *Sporleder* each followed precedent holding that a person may legitimately expect a bank to use records of his financial transactions only for business purposes. *See Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 529 P.2d 590, 118 Cal.Rptr. 166

*State v. Hunt,* 91 N.J. 338, 450 A.2d 952 (1982) (applied to toll billing records);[9] *see also* Dissenting Opinions by Stewart and Marshall, JJ., in *Smith v. Maryland, supra.*

On the present appeal, the parties have not addressed issues concerning the retrospective application of newly-announced constitutional rules. However, principles of retroactivity as well as fairness and justice clearly dictate that appellants receive the benefit of the rule announced today. *See United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *Commonwealth v. Geschwendt,* 500 Pa. 120, 454 A.2d 991 (1982) (Opinion by Nix, J.); *cf. State v. Hunt, supra* (applying rule prospectively). Further enlargement on the retrospectivity question must await future cases.

Appellants' convictions are reversed and their cases remanded for proceedings consistent with this opinion. Jurisdiction is relinquished.

(1974) (cited in *DeJohn* ); *Charles v. DiGiacomo,* 612 P.2d 1117 (Colo. 1980).

**9.** The *Hunt* decision predicating seizure of toll billing and pen register searches on a constitutional standard is especially relevant to this case because New Jersey's Wiretapping and Electronic Surveillance Act served as a model for Pennsylvania's. House Legislative Journal at 3146 (1978). *See N.J.S.A. 2A:156–1 et seq., as amended.*